State ex rel. v. White.

THE STATE ex rel. DAVIS et al. v. WHITE et al.

In Banc, May 21, 1901.

Removal of County Seat: NUMBER OF VOTES. While the statute remains as it is, a county seat can not be removed until two-thirds of the qualified voters of the county signify their assent thereto at a general election. The Constitution provides that "no county seat shall be removed unless two-thirds of the qualified voters of the county voting on the proposition at a general election vote therefor." The statute provides that it shall be removed if "two-thirds of the legal voters of said county are in favor of the removal." *Held*, that, as the Legislature had the authority, under this constitutional provision, to enact such a statute, it requires two-thirds of all the voters voting at the election to remove the county seat, and not two-thirds of those voting for or against such removal. In this case, at the general election there were 4,002 votes cast for state and national officers, and 2,111 in favor of removing the county seat, and 782 against removal. As the entire number voting for removal was not two-thirds of all the voters of the county, the county seat could not be removed.

*Mandamus.*

WRIT AWARDED.

*P. H. Cullen* for relators.

(1) It is firmly established in the jurisprudence of this State and elsewhere that when, by law, a vote is required or permitted to be taken and a majority of the legal voters is mentioned in such law as being necessary to carry the proposed measure, such majority must be a majority of all the legal

voters voting at such election.    State ex rel. v. Sutterfield, 54 Mo. 391; State v. Winkelmeier, 35 Mo. 103; State v. Francis, 95 Mo. 44; State ex rel. v. Brassfield, 67 Mo. 331; State ex rel. v. Mayor, 73 Mo. 437; State v. McGowan, 138 Mo. 187; People v. Wiant, 47 Ill. 263; People v. Brown, 11 Ill. 478; State v. Foraker, 47 Ohio St. 667, 6 L. R. A. 422; State ex rel. McClurg (Miss.), 48 L. R. A. 652; Stebbens v. Judge, 108 Mich. 698, 66 N. W. 524; Bryan v. Stephenson (Neb.), 35 L. R. A. 752; Belknap v. Louisville (Ky.), 34 L. R. A. 256; People v. Berkley (Cal.), 23 L. R. A. 838; Tecumseh Bank v. Saunders (Neb.), 71 N. W. 779; State v. Harris, 96 Mo. 29.    (2)    The Constitution declares that no county seat shall be removed unless two-thirds of the voters of the county, voting on the proposition, vote therefor.    And even this provision should be construed to require a two-thirds majority of all the votes cast, otherwise how can force and effect be given to the expression "two-thirds of the voters of the county," used in said section?    Bouldin v. Lockhart, 3 Baxt. (Tenn.), 262, 1 Lea (Tenn.), 195; Braden v. Stunpf, 16 Lea (Tenn.), 581; Patterson v. Temple, 27 Ark. 202; Hogg v. Baker (Ky.), 31 S. W. 726.    (3)    Even though it be conceded that under the Constitution two-thirds of the votes on the proposition would be sufficient to carry it, yet the constitutional provision fixes only the lowest limit on which removal may be made and does not restrict the power of the Legislature to require a larger vote than is there fixed.    Alexander v. People, 7 Colo. 155; Vance v. Ansill, 45 Ark. 400; Sanders v. Erwin, 49 Ark. 376; Hogg v. Baker (Ky.), 31 S. W. 726; Luce v. Fensler (Iowa), 52 N. W. 517; In re Kindergarten Schools, 32 Pac. Rep. 422; County Com. v. State, 4 So. Rep. 798; People v. Rhodes, 16 Pac. Rep. 298.    (4)    The provision of the Constitution is not self-enforcing.    It restricts or limits the power and authority of the Legislature, but in

order that the power retained by the Legislature may become operative, the Legislature must enact appropriate laws putting in operation these reserved powers. Railroad v. Buchanan Co., 39 Mo. 485; Fusz v. Spannhorst, 67 Mo. 256; Jerman v. Benton, 79 Mo. 148; Railroad v. Railroad, 10 Fed. Rep. 497; Schuteherr v. Bordeaux, 63 Miss. 59; Ex parte State, 52 Ala. 231; Brown v. Seay, 86 Ala. 122.

*Shepard Barclay, Claude R. Ball, J. D. Barnett, Jas. F. Ball* and *W. B. M. Cook* for respondents.

(1) The history of the organic and statutory law of Missouri, touching elections for removal of county seats, demonstrates that the vote in this case was sufficient to remove. Const. 1865, art. 4, sec. 30; Const. 1875, art. 9, sec. 2; G. S. 1865, sec. 22, p. 223; State ex rel. v. Sutterfield, 54 Mo. 391; R. S. 1879, sec. 5391, now (1899) sec. 6740; Railroad v. Evans & Howard Co., 85 Mo. 307; Lehman v. Robinson, 59 Ala. 219; Cooley, Const. Limits. (6 Ed.), p. 79. (2) A law must be construed as constitutional if possible. State v. Addington, 77 Mo. 110; Railroad v. Casey, 26 Pa. St. 287; 23 Am. and Eng. Ency. of Law, p. 349. (3) The effects of a proposed construction of a law are to be considered in reaching its intent. 1 Bl. Com., p. 60; Lamar Co. v. City of Lamar, 128 Mo. 188. (4) The words of the law—"two-thirds of the legal voters of said county"—mean such a majority voting "on the proposition at a general election," as the Constitution emphatically declares. Richardson v. McReynolds, 114 Mo. 649; State v. Mayor, 37 Mo. 270; Davis v. Brown, 46 W. Va. 716; Carroll County v. Smith, 111 U. S. 556; People v. Warfield, 20 Ill. 160; Madison Co. v. Priestly, 42 Fed. 817; Wells v. Ragsdale, 102 Ga. 53, 29 S. E. Rep. 165; State v. Cincinnati, 52 Ohio St. 419; State v. Langlie,

5 N. Dak. 594; 7 Am. and Eng. Ency. of Law (2 Ed.), p. 1034. (5) The Constitution by naming the vote "on the proposition" as a basis to figure the necessary majority, excludes the consideration of other votes in ascertaining that majority. *"Expressio unius,"* etc., applies to constitutions. Bank v. Graham, 147 Mo. 251; People v. Draper, 15 N. Y. 544; Com. v. Williams, 79 Ky. 42; People v. Raymond, 37 N. Y. 428; State v. Helmantel, 21 Wis. 566; Bouldin v. Lockhart, 3 Baxter (Tenn.), 262. (6) Elections for removal of county seats are separate elections, and so the language of the act—"by such election"—means the election "on the proposition." State v. Co. Comrs., 19 Fla. 518; People v. Warfield, 20 Ill. 160; Clark v. Jack, 60 Ala. 271. (7) Laches is a bar to relators. Mandamus is a discretionary writ. High, Extraord. Rem. (2 Ed.), sec. 9; People v. Jeroloman, 139 N. Y. 14; People v. Board, 137 N. Y. 201. (8) Mandamus will not go where, as here, important rights have vested while relators delayed their application for the writ. True v. Melvin, 43 N. H. 503; State v. Young, 84 Mo. 90; State v. Finley, 74 Mo. App. 216; McDowell v. County Co., 96 N. C. 514.

VALLIANT, J.—Original mandamus.

At the general election in November, 1900, a proposition to remove the county seat from Danville to Montgomery City was submitted to the voters of Montgomery county. At that election there were 4,002 votes cast for the candidates for national and state offices, 2,111 votes cast in favor of the removal of the county seat and 782 against that proposition. In due time the county court canvassed the vote and declared the proposition to remove carried, appointed commissioners who selected the site, which was duly approved, a deed to the same was made out and accepted, and the county court as-

signed rooms in the building for the county offices, respectively. The object of this suit is to require the county court to annul its proceedings in this matter, declare the proposition to remove not carried, and require the respondents composing the county court to retain the county seat at Danville.

There is no dispute as to the facts. From the record it appears that more than two-thirds of those who voted on the proposition to remove voted in favor of it, but it does not appear that two-thirds of the legal voters of the county voted for the removal. The sole question for our consideration is, did the vote authorize the removal?

The language of the statute is: "If it shall appear by such election that two-thirds of the legal voters of said county are in favor of the removal of the county seat of such county, then the county court shall appoint five commissioners to select a site whereon to locate the seat of justice." [R. S. 1899, sec. 6740.]

This section appeared in the General Statutes of 1865, p. 223, except that for "legal voters" as it now is, it was "legally registered voters." At that time the law required registration as a prerequisite to the right to vote. In 1879, the general requirement of registration having been eliminated, this statute was revised into the form in which we now have it, specifying only "legal voters of said county."

The principle involved in this case has several times received the consideration of this court. As early as 1864 a similar question arose on the construction of an Act of 1857, which authorized the city of St. Louis to license persons to keep open refreshment booths on Sunday "whenever a majority of the legal voters" of the city should authorize it. The proposition had been submitted at an election when city officers were elected and at which more than 13,000 votes had been cast for candidates for city offices, 5,035 votes were for

and 2,001 against the proposition. The court held that the proper construction of the statute required a majority "of all the legal voters of the city," and not merely those voting on the proposition, and that the license to keep the establishment open on Sunday, attempted to be granted by the city to defendant founded on the assumption that the proposition had carried, was invalid.    [State v. Winkelmeier, 35 Mo. 103.]

Very shortly afterwards a similar case came before the court wherein the defendant claimed to hold a license of like character based on the same election, and it was held that his license was valid.    [State v. Binder, 38 Mo. 450.]

But in the last-named case the record did not show how many votes had been cast for the candidates for office; it only showed the vote on the proposition.    The court, therefore, unless it had taken cognizance of a fact outside the record in the case before it, had no information except as to the vote on the proposition.    In the opinion it is said:   "An election was held, accordingly, on the day named, the result of which was, as it appeared by the returns of the vote to the city register (a certified copy of which was given in evidence), that the whole number of votes cast at said election was seven thousand and eighty-five, of which five thousand and fifty-one were given in the affirmative, and two thousand and thirty-four in the negative of the proposition. . . . . This was the whole evidence concerning the election and vote."   That case, therefore, can not be considered as at all in conflict with State v. Winkelmeier.

In State ex rel. v. Sutterfield, 54 Mo. 391, the court construed the statute involved in the case now under consideration, as it was in 1865, when it required the assent of two-thirds of "all legally registered voters."    At the election in that case 547 votes for candidates had been cast, 244 for and 47 against removing the county seat.    It was also shown that there were 694 names on the registration lists at that time.    At that time

the Constitution ordained that " the General Assembly shall have no power to remove the county seat of any county unless two-thirds of the qualified voters of the county at a general election shall vote in favor of such removal." The court said: "The words do not imply an acquiescence or a negative sanction, or a negative assent inferred from absence, but a positive vote in the affirmative. . . . . The statute in this case uses the words, 'legally registered voters,' and requires two-thirds of them to vote for the change."

In State ex rel. v. Brassfield, 67 Mo. 331, it was held that the clause of the Constitution (sec. 14, art. 11, 1865), which declared that "the General Assembly shall not authorize any county, city or town to become a stockholder in . . . . any . . . . corporation unless two-thirds of the qualified voters of such county, city or town, at a regular or special election to be held therein, assent thereto," meant all the legal voters in the county, city or town and not merely all who voted. And it may be said that all the utterances of this court that bear on this question are to the same effect. [State ex rel. v. Mayor, 73 Mo. 437; State ex rel. v. Francis, 95 Mo. 44; State ex rel. v. McGowan, 138 Mo. 187.]

It will be noticed that the two cases last above quoted from turned chiefly upon the construction given the clause of the Constitution in question in each case, although the statute then in question was also a subject of construction. In each instance the general form of expression in the Constitution was to place a restriction on a power existing, whilst that of the statute was to confer a power; the requirement of the Constitution was that the act shall not be done "unless," etc., while the provisions of the statute was that it may be done, "if," etc., the statute's permission being intended to be within the limits of the Constitution's restriction. In the Sutterfield case the Constitution had forbidden the removal unless two-thirds of the

qualified voters had assented thereto, and the statute had declared that the removal might be effected if two-thirds of the "legally registered voters" had assented. The court said that the Constitution was not satisfied with two-thirds of those voting, but required two-thirds of all in the county entitled to vote. And in the Brassfield case, when the Legislature had undertaken to say that the affirmative vote of two-thirds of those voting would authorize the stock subscription in the face of the Constitution, which ordained that it should not be done until two-thirds of the qualified voters had given their assent, the court said that the act of the Legislature was invalid. In the Brassfield case the Constitution had said that the act should not be done unless a certain proportion of the voters of the county assented thereto while the Legislature had said that it might be done if a less proportion assented. Now, in the case at bar, the Constitution has said that the act shall not be done unless a certain proportion of the voters of the county approve it, and the Legislature has said it may be done if a greater proportion than that named by the Constitution approve it. The Consitution is satisfied if two-thirds of those voting at the election on the proposition approve it, but the Legislature does not give its consent until two-thirds of all the legal voters in the county approve it. This change was brought about by the Constitution of 1875. "The General Assembly shall have no power to remove the county seat of any county, but the removal of county seats shall be provided for by general law; and no county seat shall be removed unless two-thirds of the qualified voters of the county voting on the proposition at a general election vote therefor." [Art. 9, sec. 2, 1875.]

It is argued by the learned counsel for respondents that the object of this change in the Constitution was to change the rule laid down by this court in the Sutterfield case. The rule laid down in that case was not a declaration of any principle of

law, but merely an interpretation of words employed in the Constitution and the statute. It was there said that when the words "qualified voters of the county" were used, they meant all those in the county who were entitled to vote and not merely those who voted on the question. If the framers of the Constitution of 1875 had intended to change the law of the State in respect of interpretation of such words from that which this court had uniformly put upon them, they would have said in effect that such words thereafter occurring in the written law should be construed as indicated. But instead of that they effected a change in the law, not by repeating the former words and requiring for them a new interpretation, but by adding other words to them so as to materially change their meaning. The Constitution no longer now forbids the removal of the county seat unless two-thirds of all those in the county having the right to vote give their votes in favor of the removal, but only forbids it until it receives the approval of two-thirds of those qualified voters who take enough interest in the matter to express their opinions at the polls. But the language of the Constitution is still in the form of a restriction on the power of the Legislature. It does not undertake to confer upon the county court or the people of the county the power to remove their county seat, nor does it confer that power on the General Assembly. If the Constitution was silent on the subject the General Assembly would be absolute in its power; that power the Constitution silently recognizes and merely puts limitations upon it. These limitations are that such removals shall be effected only in pursuance of a general law and not in any instance unless with the approval of two-thirds of those voting on the proposition. Therefore, the General Assembly can not by its own act remove a county seat nor can it pass a special law for the removal of the county seat of Montgomery county, nor authorize the removal with less than two-thirds of the

qualified voters of the county voting on the proposition, assent-ing; but in all other respects the subject is within the discre-tion of the Legislature which can, if it sees fit, require a larger proportion of the voters to give their approval than the mini-mum limit prescribed by the Constitution. The words in our statute of to-day "two-thirds of the legal voters of said county" mean just what the corresponding words in the former statutes were construed to mean in State ex rel. v. Sutterfield, and State ex rel. v. Brassfield, supra. The General Assembly has not seen fit, since the adoption of the Constitution of 1875, to make any change in the requirement in this respect, and we can make none.

The Constitution of Colorado is, in the particular fea-ture we are now discussing, exactly like ours except that it forbids the removal unless a *majority* of the voters assent. The Legislature in that State passed an act requiring the assent of two-thirds of the voters to a removal of a county seat. It was contended that the act of the Legislature was invalid. The Colorado court in an able opinion by Beck, C. J. (Alex-ander v. People, 7 Col. 155), held that except as restricted by the Constitution, the will of the Legislature was supreme in the matter, drawing the distinction between the powers of Con-gress conferred by the Federal Constitution and the inherent powers of a State Legislature; said that court: "There would be greater force in the argument employed to demonstrate the invalidity of the law of 1881, if the State Constitution, like the National Constitution, was a grant of enumerated powers. In such case we would look into the Constitution to see if the grant was broad enough to authorize the Legislature to declare what vote should be necessary to remove a county seat. But the Legislature being invested with complete powers for all the purposes of civil government, and the State Constitution being merely a limitation upon that power, we look into it, not to

see if the enactment in question is authorized, but only to see if it is prohibited." Then after showing that the Legislature could not cross the bounds of restriction the court said: "It would seem, on principle, however, that above and beyond, or outside, the minimum limit, the jurisdiction would be unrestrained. This being so, the Legislature would be as free to exercise its power and discretion in the *unlimited* jurisdiction as if no minimum limit on its powers had been imposed." And so that court held that notwithstanding the Constitution said that the removal should not take place "unless a majority of the qualified electors of the county voting on the proposition at a general election, vote therefor," the act of the Legislature governed the case which declared "that not less than two-thirds of all the legal votes cast shall be necessary to effect the removal."

It may be that in the sometimes-hurried course of revision the language of our statute as we now have it has been repeated in the several revisions since the adoption of our present Constitution without very close attention to the change of terms from the old to the new Constitution, but a court can not take such a hypothesis into account. We must take the law as it is written and assume that it expresses the deliberate mind of the lawmaker.

We are not indifferent to the argument of the importance of this question to the people of Montgomery county and the inconvenience that will attend the annulling of the act of the county court essaying to remove the county seat from Danville, but a court has no right to allow such considerations to influence its judgment. While the statute remains as it is, the county seat can not be removed until two-thirds of the qualified voters of the county signify their assent thereto at a general election; that they have not yet done. The general election in 1900 showed that there were 4,002 qualified voters in the

county; it would, therefore, have required the affirmative vote of 2,668 of them to have effected the proposed removal. If two-thirds of the voters of that county favor the removal they have not taken sufficient interest in the matter to give effect to their preference.

We do not perceive anything in the case to justify a refusal of the writ on the ground of laches in the relators; they seem to have moved with as much expedition as could be expected.

The peremptory writ of mandamus is awarded. *Robinson, Brace* and *Gantt, JJ.,* concur; *Burgess, C. J.,* and *Sherwood, J.,* dissent; *Marshall, J.,* absent.