[No. 24848.   *En Banc.*   December 19, 1933.]

K. Robb, *Respondent*, v. The City of Tacoma *et al.,*
*Appellants.*[1]

[1]Reported in 28 P. (2d) 327.

*W. W. Mount, John E. Gallagher,* and *Bartlett Rummel,* for appellants.

*Leo Teats* and *Ralph Teats,* for respondent.

*S. F. McAnally, Rex S. Roudebush, Burcham & Blair,* and *G. M. Ferris, amici curiae.*

STEINERT, J.—This action was brought by a taxpayer of the city of Tacoma to test the validity of a proposed sewer bond issue. A demurrer to the complaint having been overruled, the defendants filed an answer admitting all the allegations of the complaint, save one, which presented only a question of law; the answer also contained an affirmative defense, to which a demurrer was interposed and sustained. Upon refusal of the defendants to plead further, judgment was entered enjoining the city and its officials from proceeding with the issuance and sale of the bonds. The defendants have appealed from the judgment.

The facts upon which respondent's case rests, as shown by the complaint, are these: On August 11, 1933, the city council of Tacoma passed an ordinance providing for the submission to the qualified voters of the city, at a special municipal election, of a proposition for creating an indebtedness in the amount of three million dollars and the issuance and sale of general negotiable bonds of the city, for the purpose of providing funds for the construction of storm and sanitary trunk sewer improvements; the ordinance further providing for the levy and collection of taxes to pay the principal and interest of such bonds.

Pursuant to the passage of the ordinance, the election was held on September 26, 1933. Thereafter, the election board made a canvass of the returns and found that, of the total number of 16,945 persons voting at the election, 13,617 had voted in favor of the issuance of the bonds, and that 3,248 had voted against it. The board further found that, on the question whether the council should be authorized to levy taxes in excess of fifteen mills to pay the principal and interest charges on the proposed bond issue, 11,676 persons had voted in the affirmative and 4,732 had voted in the negative. The indebtedness sought to be incurred by the issuance of these bonds exceeds one and one-half per cent of the taxable property in the city of Tacoma, and the tax proposed to be levied for the purpose of paying the principal and interest of the bonds exceeds the fifteen-mill limit allowed by law for municipal purposes.

On November 8, 1932, there was held in Tacoma a general election, at which a total number of 45,617 persons voted. The number of votes cast at the bond election held September 26, 1933, was less than fifty per cent of the number of votes cast at the general election held November 8, 1932.

On August 29, 1933, an election was held in Tacoma for the purpose of electing delegates to the convention to be held in Olympia, Washington, on October 3, 1933, for the purpose of ratifying or rejecting the proposed twenty-first amendment to the constitution of the United States. At that election, 26,107 votes were cast in Tacoma. The number of votes cast at the bond election held September 26, 1933, was in excess of fifty per cent of the total number of votes cast at the election held August 29, 1933. It is alleged in the complaint that the election held August 29, 1933, was *not* a general election, but that the election board of Pierce county had, nevertheless, certified that it *was*.

Pursuant to the bond election held September 26, 1933, the city council, on October 11, 1933, passed an ordinance ratifying and confirming the loan of three million dollars, authorizing the issuance and sale of bonds therefor, and providing for the levy and collection of taxes to meet the payment of principal and interest of such bonds. Under the authority thus conferred, the city council proposed to issue and sell the bonds. As already stated, a demurrer to the complaint was overruled.

The answer admitted all of the allegations of the complaint except the one to the effect that the election held August 29, 1933, with reference to the Federal amendment, was not a general election; that allegation was denied.

The affirmative defense contained the following allegations: That the sanitary sewer facilities of the city of Tacoma were wholly inadequate, and were detrimental to the public health; that, for some time past, United States and state health officers had protested against the existing sanitary and trunk sewer conditions in Tacoma, and had ordered the installation of adequate sewer facilities; that the city council had attempted to comply with such demands by working out plans and means for financing such project; that the city was constantly confronted with damage claims alleged to have been caused by inadequate sewer facilities; that due and legal notice had been given of the bond election held September 26, 1933, and that such notice had been supplemented by editorial and advertising publicity; that over three-fifths of those voting on the proposition at the bond election had voted in the affirmative; that the election held August 29, 1933, relative to the Federal amendment, was a general election; that the number of votes cast at the bond election was in excess of fifty per cent of the number of votes

cast at the election held August 29, 1933; that the sewer bonds were to be sold to the Federal government, and that the city would thereby receive a grant of thirty per cent of the cost of labor and material in accordance with the government's plan to aid and encourage public work projects; and that the particular project would provide direct employment for a great many men, and thus relieve the conditions of want and starvation then existing among a large number of families in the city of Tacoma. The court sustained a demurrer to the affirmative defense.

There are three questions involved in this appeal. The first question concerns the constitutionality of Rem. Rev. Stat., § 5646-1. Art. VIII, § 6, of the state constitution, which it is contended the statute offends, reads as follows:

"No county, city, town, school district, or other municipal corporation shall for any purpose become indebted in any manner to an amount exceeding one and one-half per centum of the taxable property in such county, city, town, school district, or other municipal corporation, without the assent of three-fifths of the voters therein voting at an election to be held for that purpose, nor in cases requiring such assent shall the total indebtedness at any time exceed five per centum on the value of the taxable property therein, to be ascertained by the last assessment for state and county purposes previous to the incurring of such indebtedness, except that in incorporated cities the assessment shall be taken from the last assessment for city purposes: Provided, that no part of the indebtedness allowed in this section shall be incurred for any purpose other than strictly county, city, town, school district, or other municipal purposes: Provided further, that any city or town, with such assent, may be allowed to become indebted to a larger amount, but not exceeding five per centum additional for supplying such city or town with water, artificial light, and sewers, when the works for supplying such water,

light, and sewers shall be owned and controlled by the municipality.''

Rem. Rev. Stat., § 5646-1, which it is alleged offends the above portion of the constitution, reads as follows:

''No general obligation bonds of any county, city, town, port district, or metropolitan park district upon which a vote of the people is required under existing laws shall be issued, nor shall they become a lien upon the taxable property within such municipality or district unless, in addition to all other requirements provided by law in the matter of the issuance of general obligation bonds by such municipality or district, the total vote cast upon such proposition shall exceed fifty per cent of the total number of voters voting in such municipality or district at the general county or state election next preceding such bond election.''

It will be noted that the statute contains a provision, the effect of which may require a greater number of votes, in order to create a municipal indebtedness, than is required by the constitution. The constitution requires only a three-fifths majority of those voting at a bond election in order to validate a bond issue. The statute requires, in addition, that the total number of votes cast at such bond election be in excess of fifty per cent of the total number of votes cast at the next preceding ''general county or state election.''

The present case well illustrates the difference between the requirements of the constitution and those of the statute. Under the provisions of the constitution alone, the present bonds would be authorized, because the number of votes cast in the affirmative, at the bond election, was far in excess of the necessary three-fifths majority. But, under the added provision of the statute, if the general election of 1932 fixed the

total number of votes necessary to be cast at the bond election, then the bonds were never authorized at all.

The appellants contend, first, that the statute is, in any event, unconstitutional, and that the bond election was in no way affected by the number of votes cast at any preceding general election.

■ In passing upon the constitutionality of a legislative enactment, several things must always be kept in mind. Courts do not sit to review or revise legislative action, but rather to enforce the legislative will when acting within its constitutional limits. A legislative act carries with it the presumption of its constitutionality, and will not be declared void unless its invalidity appears beyond a reasonable doubt. If the act is fairly and reasonably open to more than one construction, that construction will be adopted which will harmonize the statute with the constitution and avoid a conflict therewith. *Smith v. City of Seattle,* 25 Wash. 300, 65 Pac. 612; *Litchman v. Shannon,* 90 Wash. 186, 155 Pac. 783; *Record Publishing Co. v. Monson,* 123 Wash. 569, 213 Pac. 13; 1 Cooley's Constitutional Limitations (8th ed.), p. 371, *et seq.*

■ There is a distinct difference with reference to the powers that may be exercised under the constitution of the United States and those that may be exercised under the constitution of the state. The government of the United States is one of enumerated powers, while the state government has all the general powers of legislation. In other words, the Federal constitution is a grant of power, while the state constitution is but a limitation upon legislative power. Therefore, when an act of congress is assailed, the court looks to the Federal constitution to see whether the *grant* of power is broad enough to embrace the particular act; but when an act of the legislature is

assailed, the court looks to the state constitution only to ascertain whether any *limitations* have been imposed upon such power. *State ex rel. Mountain Timber Co. v. Superior Court,* 77 Wash. 585, 137 Pac. 994; *James v. McMillan,* 113 Wash. 644, 194 Pac. 823; 1 Cooley's Constitutional Limitations (8th Ed.), p. 354.

In the absence of any constitutional provision whatever, the legislature would have unlimited power to fix the number of votes necessary to validate a bond election.

"In creating a legislative department and conferring upon it the legislative power, the people must be understood to have conferred the full and complete power as it rests in, and may be exercised by, the sovereign power of any country, subject only to such restrictions as they may have seen fit to impose, and to the limitations which are contained in the Constitution of the United States." 1 Cooley's Constitutional Limitations (8th Ed.), p. 175.

Art. VIII, § 6, of the state constitution imposes a limitation upon the power of the legislature, in that it may not fix a *less* number than a three-fifths majority of the votes cast, in order to validate a bond election. But the constitution does not place any other limitation whatever upon the legislative power. It fixes a minimum limit of restriction below which the legislature may not go, but it does not fix a maximum limit to which the legislature may advance on "an ascending scale." The concluding proviso of Art. VIII, § 6, carries a very positive implication that the legislature still has the power to fix an additional limitation. It says:

"Provided, further, that any city or town, with such assent, *may be allowed* to become indebted to a larger amount . . ." (Italics supplied.)

It does not say "*shall* be allowed," but "*may* be allowed," indicating that the power conferred upon

municipalities in this respect is not plenary and unconditional, but restrictive and subject to control by the legislature.

This construction has been placed upon similar constitutional and statutory provisions in other states. In Colorado, the constitution contained a section providing

". . . that no county seat shall be removed unless a majority of the qualified voters of the county, voting on the proposition at a general election, vote therefor."

The legislature passed an act providing

". . . that not less than two-thirds of all the legal votes cast shall be necessary to effect the removal of the county seat of any county."

In passing upon the constitutionality of the act, the court, in 7 Colo. 155, 2 Pac. 894, said:

"The whole controversy depends upon the solution of the single question, whether that portion of the law of 1881 which requires a two-thirds vote to remove a county seat is in conflict with the constitutional provision that no county seat shall be removed unless a majority of the electors voting on the proposition vote therefor. . . .

"There would be greater force in the arguments employed to demonstrate the invalidity of the law of 1881, if the state constitution, like the national constitution, was a grant of enumerated powers. In such case we would look into the constitution to see if the grant was broad enough to authorize the legislature to declare what vote should be necessary to remove a county seat. But the legislature being invested with complete power for all the purposes of civil government, and the state constitution being merely a limitation upon that power, we look into it, not to see if the enactment in question is authorized, but only to see if it is prohibited.

"Another rule is, that when the validity of an act of the legislature is assailed for a supposed conflict

with the constitution, the legal presumption is in favor of the statute; and before the court will be warranted in declaring it void, a clear conflict with the constitution must be shown to exist.

"The removal of county seats is a subject over which the lawmaking power has plenary jurisdiction and control. In the absence of constitutional restriction, a removal could be authorized upon any vote, great or small, which that body deemed advisable, or without any vote at all. . . .

"It would seem, on principle, however, that above and beyond, or outside, the minimum limit, the jurisdiction would be unrestrained. This being so, the legislature would be as free to exercise its power and discretion in the *unlimited* jurisdiction as if no minimum limit on its powers had been imposed.

"The application of this principle to the present controversy would show that the supposed conflict of the statute with the constitution does not exist, but that the legislature, in the passage of the act of 1881, acted within the scope of its jurisdiction. . .

"It is no answer to this view of the subject to say, 'If the legislature can say that a greater number than a majority shall be required to remove a county seat, they can say that every voter in the county shall vote for the removal, to effect the same, and thereby render nugatory the provision of the constitution as to a majority vote, and in effect prohibit the removal of a county seat.'

"An argument in favor of such a construction of the constitution as will nullify a statute is not aided by a suggestion that, unless the construction contended for be adopted by the courts, the legislature will have the power to pass laws prejudicial to the rights of the people.

"It is not a legal inference that, if unrestrained, the chosen representatives of the people may commit either a foolish or a corrupt act. Legal presumptions are in favor of the integrity and wisdom of legislators, as well as the validity of their enactments." *Alexander v. People,* 7 Colo. 155, 2 Pac. 894.

A similar question arose in *State v. White*, 162 Mo. 533, 63 S. W. 104. The state constitution provided that "No county seat shall be removed unless two-thirds of the qualified voters of the county *voting on the proposition* at a general election vote therefor." The statute provided that two-thirds of the *legal voters of the county* vote in favor of such removal. The court said:

"If the constitution was silent on the subject the General Assembly would be absolute in its power. That power the Constitution silently recognizes and merely puts limitations upon it. These limitations are that such removals shall be effected only in pursuance of a general law and not in any instance unless with the approval of two-thirds of those voting on the proposition. Therefore, the General Assembly can not by its own act remove a county seat nor can it pass a special law for the removal of the county seat of Montgomery county, nor authorize the removal with less than two-thirds of the qualified voters of the county voting on the proposition, assenting; but in all other respects the subject is within the discretion of the Legislature which can, if it sees fit, require a larger proportion of the voters to give their approval than the minimum limit prescribed by the Constitution."

The reasoning of the court in those two cases is most forceful and convincing, and accords with our views here.

The appellants cite and rely upon a number of cases from this and other jurisdictions, as supporting their contention. In those cases, however, the questions involved were different from the one with which we are here concerned, or else were governed by constitutional provisions different from ours. We will refer to only two cases, which, we believe, are the ones chiefly relied on by appellants: *Holmes & Bull Furniture Co. v. Hedges*, 13 Wash. 696, 43 Pac. 944; *State*

*ex rel. Edwards v. Millar,* 21 Okla. 448, 96 Pac. 747.

In *Holmes & Bull Furniture Co. v. Hedges,* the question was whether Art. VIII, § 6, of the constitution was self-executing, requiring no legislative sanction to permit the holding of a school district election. The court held that the provision was self-executing, to the extent, at least, that it did not require such assent. The court said:

"We think that if the legislature has, by general enactment, made provision whereby the officers of school districts may call elections, and has determined the character of the notice to be given thereof, and the manner for conducting the same and declaring the result, that these provisions in themselves are sufficient; that the right to give or withhold assent to the incurring of the indebtedness belongs under the constitution to the voters without other legislative authority or permission; that to this extent at least the provision of the constitution in question is self-executing. The provision of the constitution should be construed as amounting to something more than a limitation upon legislative discretion. True, the provision in and of itself is silent as to the manner of holding such elections, but the legislature by general enactment has provided the manner for calling and conducting both annual and special school elections; and indeed like provisions existed in the territorial statutes at the time of the adoption of the constitution, and these provisions were by the constitution continued in force, (subject, of course, to the power of the legislature to alter or repeal them); of which provisions it is only fair to presume that the framers of that instrument had full and necessary information."

The decision in that case does not cover or control the question here. There the court simply held that the provision of the constitution was self-executing, to the extent that it directly authorized the holding of the election under the machinery already provided

therefor by the legislature, and did not require any further legislative action or assent. The case did not touch the question whether the legislature may impose restrictions greater than those fixed by the constitution. In fact, the opinion states, in the language above quoted, that the legislature could alter or repeal the machinery provided by it for calling and conducting such election.

In *State v. Millar, supra,* it appears that Art. X, § 27, of the Oklahoma constitution was as follows:

"Any incorporated city or town in this state may, by a majority of the qualified property taxpaying voters of such city or town voting at an election to be held for that purpose, be allowed to become indebted in a larger amount . . . : Provided, that any such city or town incurring any such indebtedness requiring the assent of the voters as aforesaid, shall have the power to provide for, and, before or at the time of incurring such indebtedness shall provide for the collection of an annual tax in addition to the other taxes provided for by this Constitution sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof within twenty-five years from the time of contracting the same."

The distinction between the Oklahoma constitution and our constitution is at once apparent, in two respects, at least. In the first place, the particular provision of the Oklahoma constitution is affirmative and permissive, while ours is negative and prohibitive. In the second place, as the court in the Oklahoma case said, the section itself furnished the answer to the question as to how the city was *to be allowed* to become indebted. It was "by a majority of the qualified property taxpaying voters of such city or town, voting at an election to be held for that purpose." To express the idea contained in appellants' contention

here, our constitution would have to provide that the city, with such assent, *may become indebted,* or that the city, with such assent, *is, or shall be,* allowed to become indebted. Our constitution merely provides that the city *may be* allowed to become indebted. In the absence of any specific designation in the constitution as to how or by whom such power is to be allowed, it rests only with the legislature.

We are of the opinion that Rem. Rev. Stat., § 5646-1, is not out of harmony with, nor repugnant to, Art. VIII, § 6, of the constitution, and must therefore be held to be valid and effective.

The appellant next contends that, even though Rem. Rev. Stat., § 5646-1, be constitutional, nevertheless the bonds were duly approved, because, at the bond election, they received the assent of three-fifths of the voters, and that, at such election, the total vote cast upon such proposition exceeded fifty per cent of the total number of votes cast at the election held August 29, 1933. The question thus presented is whether the election of August 29, 1933, for the purpose of selecting delegates to the Olympia convention, was a general or a special election. If it was a general election, then there was a sufficient number of votes cast at the bond election. If it was not a general election, but simply a special election, then reference would have to be had to the general election of November 8, 1932, in order to determine the number of votes necessary to be cast at the bond election. Upon the basis of the November election, the required fifty per cent did not vote at the bond election, and hence the bonds were not legally authorized.

A regular election is an election which recurs at stated intervals as fixed by law; a special election is one that arises from some exigency or special need outside the usual routine. *State ex rel. Stone v. An-*

*dresen,* 110 Ore. 1, 222 Pac. 585; 9 R. C. L., p. 978.

In defining what is a general, and what is a special, election, this court has said:

"Any election which is not regularly held for the election of officers or for some other purpose which shall come before the electors at regular fixed intervals is necessarily a special election. Had the act in question merely provided for an election on the question of adopting the commission form of government, it would have been a special election. Had it gone further and directed that a general election should be called, it would still be a special election. Manifestly the word 'special' is surplusage, and can be disregarded without affecting the validity or meaning of the statute. Moreover the word 'general,' found in the constitutional provision quoted, does not in fact make general the election therein mentioned and authorized. The framers of the constitution undoubtedly knew it would necessarily be a special election whatever it might be called. Their manifest intention was not to require a general election on the subject itself, but to require that the result of such election should be determined, not by a mere majority vote on the question, but by the majority of the vote at a general election." *State ex rel. Hunt v. Tausick,* 64 Wash. 69 (80), 116 Pac. 651, 35 L. R. A. (N. S.) 802.

In *State ex rel. Griffin v. Superior Court,* 70 Wash. 545, 127 Pac. 120, it was held that a city election was a general election within the meaning of Rem. & Bal. Code, § 6294, which provided that a petition for an election in a local unit be signed by qualified electors equal in number to at least thirty per cent of the electors voting at the last general election *within such unit.*

In defining a general election, the court said:

"A general election is an election held at stated intervals to fill the terms of public officers regularly expiring in virtue of the constitution or some statute, and at which every one having the qualifications of

an elector, as defined in the constitution and general election laws, has a right to participate. 'A general election is an election held to select an officer after the expiration of the full term of the former officer.' 15 Cyc. 278. *State ex rel. Fish v. Howell*, 59 Wash. 492, 110 Pac. 386. An inspection of the local option law convinces us that the legislature had in mind a broad question of public policy, and undertook to execute it by express provision; that is, that communities should not be called upon to submit to elections of this character with unusual frequency, and furthermore that an election should not be called unless there was a reasonable probability of its successful termination upon the lines suggested in the petition. To that end we believe that the words 'last general election' were used advisedly and mean any general election at which there has been a general and popular expression of the public will, whether that election be a state, county or city election. Whether the statute would include other elections of a *quasi* general character, we are not now called upon to decide.''

Appellants cite this case, and rely upon the next to the last sentence in the above quotation. In reading the opinion in that case, the distinction between ''the last general election within such unit,'' as therein used, and ''the general county or state election,'' as used in Rem. Rev. Stat., § 5646-1, *supra,* must be kept in mind. As defined in the *Griffin* case, a city election is a ''general election'' under Rem. & Bal. Code, § 6294, but it is not a ''general county or state election'' provided for by Rem. Rev. Stat., § 5646-1.

In construing a statute, we must search for the legislative intent. *State ex rel. Chamberlin v. Daniel,* 17 Wash. 111, 49 Pac. 243; Sutherland, Statutory Construction, §§ 245, 246. When the legislature enacted the law of 1925 (Rem. Rev. Stat., § 5646-1, *supra),* it could have had in mind no other election than the regular biennial election next preceding, for at that time there was no other kind of election that would fit

into the language of the statute. If we examine the act of 1933, making provision for the election of August 29, relative to the Federal amendment (Ch. 181, Laws of 1933, p. 697, Rem. 1933 Sup., § 5249-1 to 5249-11), it becomes manifest, we think, that the legislature was providing for a special, and not a general, election. The act is entitled

"An act relating to and providing for the calling and holding of a convention to act upon and ratify or reject proposed amendment or repeals of amendments or other parts of the constitution of the United States; providing for the election of delegates to such conventions; . . ."

The act is too long to quote in full. We will refer to only a few sections and provisions which indicate that the legislature must have regarded such election as a special one.

"Election, how held—Ballots. The election herein provided for shall *as far as practicable* be called, held and conducted except as herein otherwise provided, in the same manner as a general election under the election laws of this state." (Italics supplied) Rem. 1933 Sup., § 5249-4.

"Voters—Qualifications. Every person possessing the qualifications entitling him to vote at an election for state representatives, if held on the same date *as an election* herein provided for, shall be entitled to vote at said election." (Italics supplied) Rem. 1933 Sup., § 5249-5.

"General election, when. If a general state election is to be held within not more than six months nor less than three months of the date when the state is officially notified of the submission to it of the proposed amendment to the United States constitution, the election herein provided for shall be held on the date and as a part of [the] general election and the proclamation of the governor herein provided for shall fix as the date of the election herein provided for the date fixed by the law for holding of such general election." Rem. 1933 Sup. § 5249-9.

If the legislature had intended that the election relative to the Federal amendment was to be considered a "general state or county election," it would have said so rather than to merely adopt certain machinery, "as far as practicable," for use in a special election. We are of the opinion that the election of August 29, 1933, although it was held throughout the state generally, and to that extent possessed certain features of generality, was nevertheless a special, and not a general, election as required by Rem. Rev. Stat., § 5646-1, *supra*. It therefore follows that the required number of voters did not vote at the bond election held September 26, 1933.

Appellants' final contention is that the proposed improvement is necessary for the protection of the public health, and that an emergency exists. Certain sections of the statute are cited and relied on by the appellants: Rem. Rev. Stat., §§ 6001, 6002, 6004, 10761, 10817. In brief, those sections of the statute deal with the supervisory and supreme powers of the state board of health in matters relating to quarantine and threatened epidemics. They confer supreme authority upon the state board and certain of its officers to declare and enforce such matters of quarantine, to make special or standing orders or regulations for the prevention of the spread of contagious and infectious diseases, and to make and enforce orders in local matters when, in the opinion of the state board, an emergency exists, and the local board of health neglects or refuses to act with sufficient promptness or efficiency. All expenses so incurred are to be paid by the county out of its *general* fund.

Appellants also cite a number of cases from this jurisdiction wherein it was held that the acts and rulings of the board of health were final and conclusive and could not be reviewed by the courts, in the absence

of some showing that they were arbitrary, capricious or unreasonable. Those statutes and those decisions do not, in our opinion, apply to, or govern, the situation as it appears from the affirmative defense contained in the answer in the case at bar.

Possibly, the strongest case in appellants' favor is that of *McCarthy v. Kelso*, 129 Wash. 121, 223 Pac. 151, wherein it was held that the constitutional limitation upon municipal indebtedness did not apply to prevent a city from incurring indebtedness for the construction of a water filtration plant for the preservation of the health and lives of its citizens. The prevailing opinion in that case was signed by three judges, two others wrote concurring opinions, and four judges dissented. The reason underlying the result of the decision is well stated in one of the concurring opinions, wherein the author, in referring to the duty of the city as a branch of sovereignty, said:

"In its governmental capacity it is charged with the duty of preventing and abating nuisances, protecting the public health and safety, and where, in order to fulfill those governmental functions, it is necessary to exceed the constitutional limit of indebtedness, such overplus is allowable. It would not be permitted for the purpose of starting or extending waterworks, but here that is not what is intended to be done. The situation here is no different from that which would obtain were the water system privately owned, and to preserve the health of the public it was necessary to render the supply fit for use by removing pestilential conditions; it is no different from that which would obtain were there existing any one of many possible nuisances inimical to public health, which it is unquestioned the city could abate, though the cost of so doing would create a debt beyond the limit fixed by the constitution."

There is quite a difference between the issuance and enforcement of orders, generally, to abate a nuisance

or to prevent the spread of a threatened epidemic, on the one hand, and, on the other, an order compelling a city to install a vast sewage system necessitating a bonded indebtedness of three million dollars.

Furthermore, we do not think that an emergency, as contemplated by the statute and our decisions, is presented by the pleadings in this case. The condition complained of did not suddenly appear, but had been a recurring topic of discussion for a long time, as appears by the answer.

Nor does the fact that the city may, by selling its bonds to the Federal government, receive a grant of thirty per cent of the cost of labor and material, nor the further fact that such project will provide employment for needy families, make any legal difference. However opportune the time and conditions may be for such project, and however worthy the motives of the city may be, those are matters which can not affect or measure the power of the city or the extent to which it may go in the creation of general indebtedness. We are satisfied that no case of legal emergency is presented, and we therefore hold that the demurrer to the affirmative defense was properly sustained.

Having determined (1) that Rem. Rev. Stat., § 5646-1, is constitutional; (2) that the election of August 29, 1933, was not a general election; and (3) that no case of emergency is presented, it follows that the judgment of the lower court must be, and it therefore is, affirmed.

ALL CONCUR.