[No. 30187. Department One. April 17, 1947.]

CHARLES R. CAREY, *Respondent,* v. THE PORT OF SEATTLE
*et al., Appellants,* DANIEL L. HILL *et al., Respondents.*[1]

*Preston, Thorgrimson, Horowitz & Turner* and *Bogle, Bogle & Gates,* for appellants.

*Ward W. Roney,* for respondent Carey.

*Weter, Roberts & Shefelman* and *Victor D. Lawrence,* for respondents Hill *et al.*

MILLARD, J.—The commission of the Port of Seattle on September 16, 1946, adopted resolution No. 1194, which provides that the comprehensive scheme of harbor improvement for the Port of Seattle be amended to provide

[1]Reported in 179 P. (2d) 501.

for the development, improvement, and extension of the existing air terminal site of the port, located near Bow Lake in King county. On the same date, the commission of the Port of Seattle adopted resolution No. 1195, providing for the issuance of general obligation bonds in the amount of three million dollars of the port district to pay for such improvements. The resolution requested the King county election board to call a special election, to be held in the port district on the fifth day of November, 1946, for the purpose of submitting to the qualified electors of the port district the proposition whether the comprehensive scheme should be amended and whether bonds should be issued and sold to pay for the improvements. At the special election held in the port district November 5, 1946, a total of 133,025 votes were cast upon the proposition for the issuance of the general obligation bonds, of which total votes 88,732 were in favor of the bond issue and 44,293 were against the bond issue. On December 3, 1946, the port commission adopted resolution No. 1207, which provides for the issuance and sale of general obligation bonds of the district in the amount of three million dollars for the purpose of providing funds for the improvement and development of the airport terminal site mentioned above.

The general election held November 7, 1944, was "the general county or state election next preceding" the bond election of November 5, 1946, and the total number of votes cast in King county at that general election, as certified by the county auditor and the county canvassing board of election returns, was 293,132. The certificate recites that the total number of registered voters in all precincts in King county was 356,333, and that the total number of votes cast in such precincts was 293,132. This last figure represents the actual number of voters whose names were duly enrolled upon the poll books and who actually entered a voting machine booth or cast a paper ballot. Fifty per cent of this number is 146,566, or in excess of the total of 133,025 cast upon the proposition for issuing the general obligation bonds.

Plaintiff and interveners, as residents, freeholders, and taxpayers within the district of the Port of Seattle, brought this action to enjoin the impending issuance of the general obligation bonds in question on the ground that the total votes cast upon the bond proposition did not exceed fifty per cent of the total number of voters voting in the district of the Port of Seattle at the election held November 7, 1944, "the general county or state election next preceding such bond election," as required by Rem. Rev. Stat., § 5646-1 [P.P.C. § 808-113].

By affirmative defense, the port district and the commissioners of that district alleged that, in the contest for the only two county offices at the November 7, 1944, election, the total votes cast for all candidates for county commissioner first district were 254,275 and for all candidates for county commissioner third district were 256,845, and that these were the only two county offices in which there were contests.

The trial court entered its decree adjudging resolution No. 1207 of the Port of Seattle null and void and enjoining the port district and its commissioners from carrying that resolution into effect. The port district and its commissioners have appealed.

Counsel for appellants contend that the general county election is a separate and distinct election, although held at the same time as other elections; that is, although a general county election is held at the same time as a state, national, or special election, the county election does not thereby lose its distinctive character as a general county election, and that the election in 1944, at which two county commissioners were elected, was a separate and distinct county election.

It is argued that, in the absence of a certificate of the total number of voters voting for the two county commissioners, it must be concluded that the highest number of votes for any county office, which in this case would be that of county commissioner for the third district of King county, is the only basis upon which the court may logically determine

the number of voters who voted at the last general county election.

Pertinent constitutional and statutory provisions prescribing the conditions prerequisite to the issuance of the general obligation bonds involved in this case read as follows:

"No county, city, town, school district, or other municipal corporation shall for any purpose become indebted in any manner to an amount exceeding one and one-half per centum of the taxable property in such county, city, town, school district, or other municipal corporation, without the assent of three-fifths of the voters therein voting at an election to be held for that purpose, . . ." State Const. Art. VIII, § 6.

The statute (Laws of 1925, chapter 13, p. 28, § 1, Rem. Rev. Stat., § 5646-1) which prescribes the method for determination of the question whether a sufficient number of votes has been cast in a bond election like the one in the case at bar, reads as follows:

"No general obligation bonds of any . . . port district, . . . upon which a vote of the people is required under existing laws shall be issued, nor shall they become a lien upon the taxable property within such . . . district unless, in addition to all other requirements provided by law in the matter of the issuance of general obligation bonds by such . . . district, the total vote cast upon such proposition shall exceed fifty per cent of the total number of voters voting in such . . . district at the general county or state election next preceding such bond election."

The time for holding county and state elections is fixed as follows:

"The first election of county and district officers not otherwise provided for in this constitution, shall be on the Tuesday next after the first Monday in November, eighteen hundred and ninety, and thereafter all elections for such officers shall be held biennially on the Tuesday next succeeding the first Monday in November. The first election of all state officers not otherwise provided for in this constitution, after the election held for the adoption of this constitution, shall be on the Tuesday next after the first Monday in November,

eighteen hundred and ninety-two, and the elections for such state officers shall be held in every fourth year thereafter on the Tuesday succeeding the first Monday in November." State Const. Art. VI, § 8.

█ That the language "the general county or state election next preceding such bond election" in Rem. Rev. Stat., § 5646-1, refers to the general election held biennially for county or state officers as prescribed by Art. VI, § 8, of the state constitution quoted above, is obvious, for the reason that, at the time the statute was enacted, there was not any other election the legislature could have had in mind. We so stated, as follows, in *Robb v. Tacoma,* 175 Wash. 580, 28 P. (2d) 327, 91 A. L. R. 1010, where we construed that statutory language to refer to such regular biennial election:

"In construing a statute, we must search for the legislative intent. *State ex rel. Chamberlin v. Daniel,* 17 Wash. 111, 49 Pac. 243; Sutherland, Statutory Construction, §§ 245, 246. When the legislature enacted the law of 1925 (Rem. Rev. Stat., § 5646-1, *supra*), it could have had in mind no other election than the regular biennial election next preceding, for at that time there was no other kind of election that would fit into the language of the statute."

The constitution, Art. XI, § 5, as amended by the twelfth amendment, provides that the legislature, by general and uniform laws, shall provide for the election in the several counties of boards of county commissioners. The only county contests appearing on the 1944 general election ballot in King county were the contests for two county commissioner positions. The term of office of all county and precinct officers elected on and after the Tuesday next following the first Monday in November, 1922, was increased from two years to four years by the legislature of 1919 (Rem. Rev. Stat., § 4029 [P.P.C. § 532-1]). That enactment has no applicability to the office of county commissioner, as is manifest from the following language appearing in that statute: ". . . Provided, that this act shall not apply to county commissioners."

The references in the statutes concerning the election and terms of county commissioners are found in Rem. Rev.

Stat., §§ 4036, 4038, 4039, 4040 [P.P.C. §§ 480-1, -57, -61, -63]. Those statutes refer to the election of county commissioners at the general election of 1882 and biennially thereafter, as provided in the statutes, and "at the next general election after the" act becomes effective, and again, "at the next general election thereafter." There is nothing in the statutes with reference to the election of county commissioners on which to base a logical argument that the election of county commissioners must be considered distinct from the remainder of the general election ballot or that the election of county commissioners solely constitutes a distinctive county election.

■ A county canvassing board of election returns for all general and special county and state elections in each county consists of the county auditor, chairman of the board of county commissioners, and the prosecuting attorney of the county. Rem. Rev. Stat., § 5340 [P.P.C. § 525-21]. The statute makes it the duty of that board to canvass the votes cast at the election in the different precincts of the county and prepare and execute a statement concerning the votes. If the county auditor fails to accurately return the total number of votes counted, he is guilty of a misdemeanor. The county auditor is required (Rem. Rev. Stat., § 5346 [P.P.C. § 525-35]) to transmit a certified copy of the abstract of votes in his county in every general or special election, for members of the legislature, county, state or district officers, or members of congress, to the secretary of state, who is required by the statute to supply uniform and proper blanks to each county auditor on which the county auditor shall make returns to the secretary's office. The certificates of the county auditor and the county canvassing board of election returns certified to the total number of votes cast in King county at the 1944 general election, or to the official returns of duly authorized public officers made in performance of a duty prescribed by statute and in accordance with the uniformly established election procedure in this state. The official certificate of the county auditor pertaining to the 1944 gen-

eral election certified that the total number of votes cast in King county was 293,132.

The total number of votes upon the bond proposition both for and against was 133,025, which is less than fifty per cent of the total of 293,132 voters voting in the port district, which is coterminous with King county, at the 1944 general county or state election which next preceded the bond election; hence, there has not been a compliance with the requirement of Rem. Rev. Stat., § 5646-1 that the total votes cast upon such proposition shall exceed fifty per cent of the total number of voters voting in such district at the general county or state election next preceding such bond election.

In *Robb v. Tacoma*, 175 Wash. 580, 28 P. (2d) 327, 91 A. L. R. 1010, which involved the same statute (Rem. Rev. Stat., § 5646-1) which is before us in the case at bar, we stated that on November 8, 1932, there was held in Tacoma a general election, at which a total number of 45,617 persons voted. At a special municipal election September 26, 1933, there was submitted to the voters of Tacoma a proposition for issuance of general negotiable bonds of the city for the purpose of providing funds for the construction of storm and sanitary trunk sewer improvements. The number of votes cast at that election was 16,408, which was less than fifty per cent of the number of votes cast at the general election held November 8, 1932, which was the November general election for national, state, county, and district offices, but no differentiation of the total vote cast was attempted on the basis of separate and distinct elections.

The general election of 1932 fixed the total number of votes necessary to be cast at the bond election; therefore, as the total number of votes cast at the bond election was not in excess of fifty per cent of the total number of votes cast in the next preceding "general county or state election," which was the general election of 1932, the bonds were never authorized at all.

Each voter is not required to vote for each office or position appearing on the ballot. It is a matter of common

knowledge that in elections, such as the 1944 general election, each voter does not vote for each office or proposition on the ballot. We know of no better method than the one prescribed by the statute of determining the number of votes cast at an election. The argument that it must be assumed that the highest number of votes (256,846 for office of commissioner of third district) cast in the county, as distinguished from the state, election were the total number of votes cast in the general county election, is without substantial merit. To so hold, we would have to speculate whether those voting at the general election and voting only for the two offices of county commissioner were limited to 256,845.

█  Under the statute (Rem. Rev. Stat., § 5346 [P.P.C. § 525-35]), the county canvassing board was authorized and required to find and declare the total number of votes cast at that 1944 election, and the statement contained in that board's abstract of votes is official and must be accepted as the standard of determination of the number of persons voting at an election until properly challenged and refuted. We have consistently followed the rule that the certificate of election officials as to the number of voters voting at an election, based upon the poll books, must be accepted until impeached by direct attack.

Some of the authorities upon which appellants rely are those in which there is no official certificate concerning the total number of votes. It is unnecessary to review all of the authorities cited, in view of the rule just mentioned, followed in this state.

*Board of Trustees v. Board of Commissioners,* 61 Kan. 796, 60 Pac. 1057, presented the question of the result of an election whether a high school should be continued. The pertinent Kansas statute provided that the question be submitted to the electors at a general election, and if a majority of the voters voting at such election should vote "no," the school should be disestablished. In determining the total number of voters voting at the election, the court adopted the rule that the figures should be computed by

adding the total number of voters whose names appeared on the poll books. The court said:

"It is contended that the canvassing board wrongfully assumed that all the persons whose names appear on the poll-books voted at the election. We know of no better method of arriving at the number of votes cast at an election than by counting the names as they appear upon the poll-books. It is not to be presumed that any person whose name appears thereon did not vote, but that all there named appeared personally and cast their ballots. We must assume that all persons whose names appear on the poll-books voted at the election."

When the legislature enacted the law of 1925 (Rem. Rev. Stat., § 5646-1), it had in mind no other election than the regular biennial election next preceding, for it must be borne in mind at the time of that enactment there was no other kind of election that would fit into the language of the statute. Manifestly, the legislature did not contemplate, or it would have provided therefor, that an election such as the one involved in the case at bar, in which only two county commissioners were elected, was a general county election. A general county election would be one held for the election of county officers generally and not one restricted to two county officers.

The bonds which appellants seek to issue and sell are invalid, as the number of voters participating in the bond election did not constitute fifty per cent of the total number of votes cast in the port district, the boundaries of which are coterminous with the county, at the next preceding general election of 1944.

The judgment is affirmed.

SIMPSON, SCHWELLENBACH, and ABEL, JJ., concur.

MALLERY, C. J., concurs in the result.