55 P.(2d) 40

**VARNEY v. CITY OF ALBUQUERQUE.**
No. 4185.

Supreme Court of New Mexico.
Feb. 8, 1936.

W. A. Keleher and Robert Nordhaus, both of Albuquerque, for appellant.

Merritt W. Oldaker and Mechem & Hannett, all of Albuquerque, for appellee.

BRICE, Justice.

This action was brought by appellant, a taxpayer of the city of Albuquerque, to enjoin that city from issuing or marketing certain bonds to obtain funds to build a civic auditorium. The case was heard upon bill and answer and judgment entered dismissing the bill, from which judgment an appeal has been taken to this court.

The following admitted facts are sufficient to determine the case:

The appellant is a resident taxpayer of the city of Albuquerque, N. M. On the

12th day of September, 1935, the appellee passed an ordinance submitting to the qualified voters of that city a proposal to issue bonds of the city to the amount of $222,000, the proceeds to be used to construct a civic auditorium. Thereafter the question was duly submitted at an election, at which there were cast 2,176 votes for the issuance of such bonds and 1,175 votes against it. The city of Albuquerque will issue and sell such bonds notwithstanding the proposal failed to carry by a two-thirds majority of the qualified voters who voted at such election, unless restrained by the court.

It is claimed by appellant that such bonds can be issued only under authority of section 90-2101 of the New Mexico Stats.Ann. Comp.1929, which requires that two-thirds of the votes cast at an election shall favor their issuance. On the other hand, the appellee contends: First, a civic auditorium is a "needful building" within the fifth subdivision of section 90-402 or at least a "public building" within the sixth subdivision of section 90-402, and therefore bonds for obtaining funds to build it can be issued if a majority of the legal votes cast favored it, and, second, that section 90-2101 of the Statutes runs counter to section 12 of article 9 of the State Constitution, in that it provides for the approval of more than a majority of the qualified electors voting on the question to authorize the bond issue in question.

1. Specific authority is given cities, towns, and villages of over 5,000 inhabitants by section 90-2101, N.M.Stats.Ann., Comp.1929 (chapter 29, § 1, Session Laws 1927), to build civic auditoriums, and not limited to the building of such auditoriums in conjunction with the counties in which such municipalities are situated as appellee contends. The pertinent part of the act is as follows: "90-2101. *Cities of five thousand population may erect and improve public auditorium.* That any incorporated city, town or village in this state having a population of at least five thousand shall have power to purchase, improve or erect public auditoriums or buildings of a similar nature for general civic purposes, or to authorize the improvement or erection of same by agreement with the officers of the county in which the municipality is located, and shall have power to issue and sell bonds for the purposes herein mentioned. Provided, * * * if two-thirds of all legal votes cast at a legal election therefor shall be in favor of the issuance of such bonds, it shall be the duty of the authorities of such city, town or village to have such bonds issued as soon as practicable."

The statute is otherwise full and complete within itself, providing for the issuance of the bonds, their form and conditions, the levying and collection of taxes to pay interest, and for redemption, etc.

The general authority to build public buildings under which appellee contends it is authorized to build the civic auditorium was a legislative act of 1884, now subdivisions fifth and sixth of section 90-402 N. M.Stats.Ann., Comp.1929, the pertinent parts of which are as follows:

"*Public buildings.* Fifth. To erect all needful buildings for the use of the city or town.

"*Borrowing money—Bond issue.* Sixth. To contract an indebtedness on behalf of the city, and upon the credit thereof, by borrowing money or issuing the bonds of the city or town for the following purposes, to-wit: For the purpose of erecting public buildings; * * * but no such debt shall be created, unless the question of incurring the same shall, at a regular election of officers for the city, be submitted to a vote of such qualified electors of the city or town as shall in the next preceding year have paid a property tax therein, and a majority of those voting upon the question, by ballot deposited in a separate ballot box, shall vote in favor of creating such debt."

 A statute enacted for the primary purpose of dealing with a particular subject prescribing terms and conditions covering the subject-matter supersedes a general statute which does not refer to that subject although broad enough to cover it. This rule of construction is so well established that we content ourselves with citing a few of the cases at hand. Gardner v. School District, 34 Okl. 716, 126 P. 1018; Ulster County v. State, 177 N.Y. 189, 69 N.E. 370; People ex rel. Fore v. Mo. Pac. Ry. Co., 342 Ill. 226, 173 N.E. 816; Daniels v. State, 150 Ind. 348, 50 N. E. 74; City of Marshall v. State Bank of Marshall, 60 Tex.Civ.App. 508, 127 S.W. 1083; Thomas v. Evans, 73 Ohio St. 140,

76 N.E. 862; Gilkeson v. Mo. Pac. Ry. Co., 222 Mo. 173, 121 S.W. 138, 24 L.R.A.(N.S.) 844, 17 Ann.Cas. 763; Townsend v. Little et al., 109 U.S. 504, 3 S.Ct. 357, 27 L.Ed. 1012; Carolina-Tennessee Power Co. v. Hiawassee River Power Co., 171 N.C. 248, 88 S.E. 349.

 Section 90-2101, supra, is such a statute. If appellee ever had authority under the general statute quoted to issue the bonds in question (and their contention in that respect is supported by eminent authority, Halbruegger v. City of St. Louis, 302 Mo. 573, 262 S.W. 379, and authorities therein cited), it no longer exists, because superseded by the later act (assuming for the moment it is constitutional).

**2.** If section 90-2101 of the statute from which we have quoted does not run counter to section 12 of article 9 of the State Constitution, then the other questions presented in the briefs of the parties become immaterial, otherwise they must be answered. That section of the Constitution is as follows: "No city, town or village shall contract any debt except by an ordinance, which shall be irrepealable until the indebtedness therein provided for shall have been fully paid or discharged, and which shall specify the purposes to which the funds to be raised shall be applied, and which shall provide for the levy of a tax, not exceeding twelve mills on the dollar upon all taxable property within such city, town or village, sufficient to pay the interest on, and to extinguish the principal of, such debt within fifty years. The proceeds of

such tax shall be applied only to the payment of such interest and principal. No such debt shall be created unless the question of incurring the same shall, at a regular election for councilmen, aldermen or other officers of such city, town or village, have been submitted to a vote of such qualified electors thereof as have paid a property tax therein during the preceding year, and a majority of those voting on the question, by ballot deposited in a separate ballot box, shall have voted in favor of creating such debt."

Section 12 of article 9 of the State Constitution confers no powers on the city, nor does it contain a grant of power to "qualified electors thereof as have paid a property tax therein during the preceding year." It provides what *shall not* be done, not what may or can be done. It does not authorize municipalities to issue bonds, but prohibits their issuance unless certain conditions precedent are performed. That the section is not self-executing was held by this court in Lanigan v. Gallup, 17 N.M. 627, 131 P. 997, and reaffirmed in State ex rel. Haas v. Board of County Com'rs of De Baca County, 32 N.M. 309, 259 P. 37, in which this court stated: "In Lanigan v. Gallup, 17 N.M. 627, 131 P. 997, we held that sections 12 and 13 of article 9 of the Constitution are not self-executing, and that cities, towns, and villages must proceed according to the statutes in such cases provided when issuing bonds. Section 10 of article 9 of the Constitution is in the same form, and therefore counties when proceeding to issue bonds for courthouse and jail purposes must proceed according to the general laws provided in such cases. The De Baca county act fails to authorize and direct the county to so proceed, and is consequently inoperative in this regard."

The appellee must look to the statutes for its authority to issue bonds, which of course cannot run counter to the Constitution. But the power of the Legislature to prescribe the conditions under which a municipality may issue bonds is only limited by section 12 of article 9 of the Constitution but not otherwise controlled.

With these general principles in view we come to consider the authority of the Legislature to require a favorable vote of two-thirds of the qualified electors voting upon the issuance of the bonds, whereas the section of the Constitution being considered provides, "No such debt shall be created unless * * * a majority of the qualified electors * * * shall have voted in favor of creating such debt." The question resolves itself into whether the statute does in fact require a favorable vote of a majority of the qualified electors before the debt can be created. The decisions are not unanimous, but the great weight of authority, and certainly the better reasoned cases, uphold the right of Legislatures to add to such constitutional restrictions if they are in fact included in those prescribed by the statute.

The most recent case on the question is Robb v. City of Tacoma et al., 175 Wash. 580, 28 P.(2d) 327, 330, 91 A.L.R. 1010.

The Constitution of Washington provides in substance that no municipal corporation shall become indebted in an amount exceeding 1½ per centum of the taxable property of such municipal corporation without the assent of three-fifths of the voters therein voting at an election to be held for that purpose. A statute provided in substance that no bonds of such municipalities could be issued unless, in addition to all other requirements provided by law, the total vote cast upon such proposition shall exceed 50 per cent. of the total number of votes cast in the municipality at the general election next preceding such bond election. In passing upon the constitutionality of this statute that court stated:

"There is a distinct difference with reference to the powers that may be exercised under the Constitution of the United States and those that may be exercised under the Constitution of the state. The government of the United States is one of enumerated powers, while the state government has all the general powers of legislation. In other words, the Federal Constitution is a grant of power, while the state Constitution is but a limitation upon legislative power. Therefore, when an Act of Congress is assailed, the court looks to the Federal Constitution to see whether the grant of power is broad enough to embrace the particular act; but when an act of the Legislature is assailed, the court looks to the state Constitution only to ascertain whether any limitations have been imposed upon such power. State ex rel. Mountain Timber Co. v. Superior Court, 77 Wash. 585, 137 P. 994; James v. McMillan, 113 Wash. 644, 194 P. 823; 1 Cooley's Constitutional Limitations (8th Ed.) p. 354. * * *

"Article 8, § 6, of the state Constitution imposes a limitation upon the power of the Legislature, in that it may not fix a less number than a three-fifths majority of the votes cast, in order to validate a bond election. But the Constitution does not place any other limitation whatever upon the legislative power. It fixes a minimum limit of restriction below which the Legislature may not go, but it does not fix a maximum limit to which the Legislature may advance on 'an ascending scale.' * * *

"We are of the opinion that Rem.Rev. Stat. § 5646-1 is not out of harmony with, nor repugnant to, article 8, § 6 of the Constitution, and must therefore be held to be valid and effective."

The Supreme Court of Colorado in Alexander v. People, 7 Colo. 155, 2 P. 894, considered this question. The Legislature enacted a law providing, among other things, "That not less than two-thirds of all the legal votes cast [upon the question] shall be necessary to effect the removal of the county seat of any county in this state." The Constitution (article 14, § 2) of that state provided: "No county seat shall be removed unless a majority of the qualified electors * * * vote therefor." In holding the statute constitutional the Colorado court, among other things, stated:

"Now, in order to make a plausible application of the authority cited, to the negative phrase of our own constitution, 'and no county seat shall be removed unless a majority of the qualified electors of the county * * * vote therefor,' it is assumed that this phraseology vests an absolute right of removal in the majority; that the language employed is self-executing and prohibitory, leaving nothing for legislative action save to provide the mode and manner of carrying the right into effect. This is assuming the very thing in dispute. If the framers of the constitution intended to vest such absolute rights, free from legislative interference, this is surely a case where they have not expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, leaving as little as possible 'to implication,' which the authorities say they are presumed to have done. Cooley, Const.Lim. 71. If we were to adopt the interpretation contended for it would be equivalent to inserting limitations in the constitution which its framers did not put there; for they are neither clearly expressed, nor do they arise, as we think, by necessary implication. * * *

"The word 'unless,' which appears in the clause under consideration, is supposed to have great force in conferring upon the phrase an affirmative meaning. Upon this point we are referred to the views expressed by Judge Folger in Manning v. Keenan, 73 N.Y. [45] 56. * * *

"Conceding the soundness of these views, we observe that they were announced in the interpretation of the phraseology of a statute, not of a constitution. The purpose and effect of the same negative sentence might be wholly different in the two instruments. For example, in the absence of constitutional provisions, the legislature would have unlimited jurisdiction on the subject of removal of county seats. Were it to enact in such case that no county seat should be removed unless a majority of the qualified electors vote therefor, there would be an affirmative implication that such a vote would authorize a removal. The practical effect of this negative phraseology would be equivalent to an affirmative enactment for the reason that it would be the latest expression of the will of a body having jurisdiction of the subject. The same provision, however, in a constitution would be a direction to the law-making power that it may not authorize by law the thing to be done upon a less vote than of a majority. If the statute, when passed, should make no requirement at all on the subject of the vote, then, doubtless, effect would be given to the affirmative implication in the constitutional provision and a majority vote be held sufficient. When the lowest limit only is fixed in the fundamental law, the legislature may act without restraint in the ascending scale, as we have before stated, and having fixed in the statute the vote which shall be required, it becomes the paramount law, and nothing is left for implication. This is but enforc-

ing the rule announced by Chief Justice Marshall, in Gibbons v. Ogden, 9 Wheat. [1] 188 [6 L.Ed. 23], that the framers of the constitution, and the people who adopted it, must be understood to have employed words in their natural sense."

A similar question to that involved in the decision of the Colorado court was before the Supreme Court of Missouri in State ex rel. Davis et al. v. White et al., 162 Mo. 533, 63 S.W. 104, 106. The Constitution of Missouri provided: "No county seat shall be removed unless two-thirds of the qualified voters of the county, voting on the proposition at a general election, vote therefor." Article 9, § 2. A statute of the state (Rev. St. 1899, § 6740) provided: "If it shall appear by such election that two-thirds of the legal voters of said county are in favor of the removal of the county seat of such county, then the county court shall appoint five commissioners," etc. We quote from the opinion in this case, as follows:

"Now in the case at bar the constitution has said that the act shall not be done unless a certain proportion of the voters of the county approve it, and the legislature has said that it may be done if a greater proportion than that named by the constitution approve it. The constitution is satisfied if two-thirds of those voting at the election on the proposition approve it, but the legislature does not give its consent until two-thirds of all the legal voters in the county approve it. * * *

"If the constitution was silent on the subject the general assembly would be absolute in its power. That power the constitution silently recognizes, and merely puts limitations upon it. These limitations are that such removals shall be effected only in pursuance of a general law, and not in any instance unless with the approval of two-thirds of those voting on the proposition. Therefore the general assembly cannot by its own act remove a county seat, nor can it pass a special law for the removal of the county seat of Montgomery county, nor authorize the removal with less than two-thirds of the qualified voters of the county voting on the proposition assenting; but in all other respects the subject is within the discretion of the legislature, which can, if it sees fit, require a larger proportion of the voters to give their approval than the minimum limit prescribed by the constitution."

This case refers with approval to Alexander v. People, supra.

The Supreme Court of Nebraska in State ex rel. Packard v. Nelson, 34 Neb. 162, 51 N.W. 648, 651, construed that State's Constitution with reference to the creation of new counties, which provides in substance that no county shall be divided without first submitting the question to a vote of the people of the county, nor unless a majority of all the legal voters of the county voting on the question shall vote for the same. A statute provided a new county could be made if three-fifths of all voters

voting upon the question in the old and new counties should vote therefor. The Nebraska court said: "In the absence of any restrictions in the constitution, the legislature could divide counties in such manner as it saw fit. It could add to or take territory from any county. It has the power to create counties, and, in the absence of constitutional restrictions, could change the same at its pleasure. * * .* So in regard to the provision for submitting the question of the formation of new counties to a vote of the people. In the absence of that provision, no vote would be necessary; but, to guard against the abuse of power, the constitution, in effect, provides that the parties immediately interested shall determine the question, and that not less than a majority shall cause the formation of a new county. The legislature recognizes this restriction, and makes no attempt to interfere with it, but adds to it by providing that at least three-fifths of the votes cast upon the question shall be necessary to effect the division. That this is within the powers of that body there is no doubt, and, as the petition shows that less than three-fifths of the votes were cast for the new county, the writ must be denied."

Also see Bauch et al. v. Cabool et al., 165 Mo.App. 486, 148 S.W. 1003.

In Dunn et al. v. Lott et al., 67 Ark. 591, 58 S.W. 375, the Supreme Court of that state in deciding a similar question said: "Our constitution prohibits the removal of a county seat without the consent of a majority of the qualified voters of the county (Const.1874, art. 13, § 3), but it does not prohibit the legislature from requiring a greater number than a majority to vote in favor of removal before changing the county seat. The legislature has the power, if it saw proper to do so, to require a two-thirds or three-fourths vote before authorizing a removal."

The case of State v. Millar, 21 Okl. 448, 96 P. 747, 752, illlustrates the difference between a self-executing provision of that State's Constitution and one that is not. Section 27 of article 10 reads: "Any incorporated city or town in this State may, by a majority of the qualified property taxpaying voters of such city or town, voting at an election to be held for that purpose, be allowed to become indebted in a larger amount than that specified in section twenty-six, for the purpose of purchasing or constructing public utilities, or for repairing the same, to be owned exclusively by such city: Provided," etc. Section 26 of the same article reads: "No county, city, town, * * * shall be allowed to become indebted, in any manner, or for any purpose, to an amount exceeding, in any year, the income and revenue provided by such year," etc. In holding that section 27 was a grant of power to the people of the municipalities, the Oklahoma court stated:

"Applying the above rules to the case at bar we are irresistibly led to the conclusion that section 27, art. 10, supra, is a grant of power to the people of the municipalities of the state and not a limitation upon the

Legislature. Some further reasons for reaching this conclusion may be drawn from other provisions of the Constitution. Section 1 of article 2 provides that: 'All political power is inherent in the people; and government is instituted for their protection, security, and benefit, and to promote their general welfare.' Probably no Constitution was ever drafted that refers to the people so much power to be exercised by direct vote. Municipal corporations are given the right by direct vote of the people to form their own municipal charters. This general underlying idea that the people themselves have the power by direct vote to control their own affairs argues persuasively that it was the intention of the Constitution to give to municipal corporations directly the right to become indebted by vote of the taxpayers for the construction of public utilities.

"It may be conceded that section 26 of article 10 is a limitation upon the power of the Legislature, there the expression is: 'No county, city, town,' etc., 'shall be allowed to become indebted, in any manner, for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year,' etc. This could not be held to mean that any municipality should be allowed to become indebted in any manner, and for any purpose by the assent of three-fifths of the voters thereof. But section 27 is a positive instead of a negative provision. The statement here is, 'Any incorporated city or town in this state may, by a majority of the qualified property taxpaying voters of such city or town,

voting at an election to be held for that purpose, be allowed to become indebted in a larger amount than that specified in section twenty-six, for the purpose of purchasing or constructing public utilities, or for repairing the same, to be owned exclusively by such city.' It is true the expression 'be allowed to become indebted' is used, but the section itself furnished the answer to the question, how allowed? which is, 'by a majority of the qualified property taxpaying voters of such city or town voting at an election to be held for that purpose.' Not that the city may be allowed by the Legislature to become indebted but by a majority of the taxpaying voters."

It is well known that the Constitution of the State of Oklahoma conferred upon the people directly many powers ordinarily left to Legislatures to confer; but in any event the section of our Constitution here considered is a negative provision conferring no powers and not self-executing like section 26 of article 10 of the Oklahoma Constitution.

As stated by appellee, the case of Board of Education of Winchester v. City of Winchester, 120 Ky. 591, 87 S.W. 768, cannot be reconciled with the above decisions. It clearly supports appellee in its contention, but we find no other authority that does (not even the previous decisions of that court, Belknap v. Louisville, 99 Ky. 474, 36 S.W. 1118, 34 L.R.A. 256, 59 Am. St.Rep. 478; Ashland v. Culbertson, 103 Ky. 161, 44 S.W. 441), except the later Kentucky case of Render v. Louisville et

al., 142 Ky. 409, 134 S.W. 458, 460, 32 L. R.A.(N.S.) 530. Section 157 of that State's Constitution provided: "No county, city, town, taxing district, or other municipality, shall be authorized or permitted to become indebted, in any manner or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year, without the assent of two-thirds of the voters thereof, voting at an election to be held for that purpose; and any indebtedness contracted in violation of this section shall be void." The Kentucky court in the opinion stated: "Every provision of the Constitution is mandatory. When it is provided that an indebtedness to a certain amount shall not be incurred without the assent of two-thirds of the electors voting at an election to be held for that purpose, it necessarily follows from the constitutional provision that such an indebtedness may be incurred with the assent of two-thirds of the voters. The Legislature can neither subtract from nor add to the constitutional requirement. The constitutional provision regulates the subject, and removes it entirely from legislative control."

The sole authority cited is an excerpt from Cooley on Constitutional Limitations, in which the author states: "Another rule of construction is that, when the Constitution defines the circumstances under which a right may be exercised or a penalty imposed, the specification is an implied prohibition against legislative interference to add to the condition, or to extend the penalty to other cases. On this ground it has been held by the Supreme Court of Maryland that, where the Constitution defines the qualifications of an officer, it is not in the power of the Legislature to change or superadd to them, unless the power to do so is expressly or by necessary implication conferred by the Constitution itself. Other cases recognizing the same principle are referred to in the note."

This text does not support the conclusion reached if applied to the section of our Constitution here considered. That section defines no circumstances under which a right may be exercised, but fixes a limitation within which a power *may not be exercised.* The case of State v. Millar, supra, illustrates the difference. The same may be said of State v. Duncan, 265 Mo. 26, 175 S.W. 940, 944, Ann.Cas.1916D, 1. Section 9 of article 9 of the Missouri Constitution is: "In any county which shall have adopted 'township organization,' the question of continuing the same may be submitted to a vote of the electors of such county at a general election, in the manner that shall be provided by law; and *if a majority of all the votes* cast upon that question *shall be against township organization,* it shall cease in said county; and all laws in force in relation to counties not having township organization shall immediately take effect and be in force in such county." A statute required a majority of all the votes *cast at the election* to be against the township organization before a county should be governed under the gen-

eral law. This was held in conflict with the Constitution. The court stated:

"Nothing can be plainer than that so much of said section 11745 as requires a larger vote in any county to discontinue township organization than that required by the Constitution (section 9, art. 9, supra) itself is invalid. There can be no two views as to this. It is equally plain also that so much of said section 11745 as prescribes for a given county after it has voted out township organization a government or procedure differing from that of a 'county which has never adopted such organization is likewise invalid. Of this, however, more hereafter. * * *

"Is section 9 of article 9 of the Constitution self-executing? It is fairly plain that so much of this section as says that 'in any county which shall have adopted "township organization," the question of continuing the same may be submitted to a vote of the electors of such county at a general election, in the manner that shall be provided by law,' is by no possible view, or by any recognized canon of construction, self-executing. It is equally clear, on the other hand, that so much of this section as provides that, 'if a majority of all the votes cast upon that question shall be against township organization, it shall cease in said county; and all laws in force in relation to counties not having township organization shall immediately take effect and be in force in said county,' is self-executing.

"This view is held upon the first proposition, viz., that the portion of this section first above quoted is not self-executing, for reasons that are plain and conclusive. The clause first above quoted does not purport to be self-executing; on the contrary, upon its face and by its very words it specifically relegates to the Legislature the duty of providing by law for the manner of submitting the question of discontinuance of township organization to the electors of a county having theretofore adopted it. It would be a contradiction in terms to hold it self-enforcing, and the citation of authority could add neither weight nor clarity to this view. On the other hand, the last clause is just as obviously self-executing; for it is clear that it needs no statute to put it in force. Any statute about the matter must needs follow the precise words or the very substance of the Constitution itself, and no statute which could be passed could clarify the matter in any respect whatever. Indeed, the clause under discussion merely expresses a status which will instantly result from the election required to be held. Statutory language would be impotent to add aught to the Constitution's expression of this resulting status, and so the clause is self-executing."

As we have seen, the Supreme Court of Washington in Robb v. City of Tacoma, supra, reviewed its opinion in Holmes & Bull Furniture Co. v. Hedges, 13 Wash. 696, 43 P. 944, wherein it said: "The decision in that case does not cover or control the question here. There the court simply held that the provision of the Constitution was self-executing to the extent

that it directly authorized the holding of the election under the machinery already provided therefor by the Legislature, and did not require any further legislative action or assent. The case did not touch the question whether the Legislature may impose restrictions greater than those fixed by the Constitution. In fact, the opinion states, in the language above quoted, that the Legislature could alter or repeal the machinery provided by it for calling and conducting such election."

Our conclusion is that section 90-2101, N.M.Ann.Stats., Comp.1929, is consistent with section 12 of article 9 of the State Constitution, is valid and supersedes all previous statutes to the extent of its subject-matter here involved, to wit, the power to borrow money to build public auditoriums.

3. While we have held section 90-2101 of the statute constitutional, and that it supersedes any other statute covering the same subject-matter, yet had we held it unconstitutional, would it not have been a legislative construction of subdivisions fifth and sixth of section 90-401 of the statutes? Did the Legislature intend that municipalities with less than 5,000 inhabitants could build auditoriums by a majority vote of their inhabitants and refuse that privilege to those of over 5,000 inhabitants; or did the Legislature impliedly determine that a civic auditorium was not a "needful public building" as contemplated by the statute? We do not find it necessary to answer these questions.

The case will be reversed and remanded, with instructions to enter a decree for appellant.

It is so ordered.

SADLER, C. J., and HUDSPETH, BICKLEY, and ZINN, JJ., concur.