303 P.2d 920

The VILLAGE OF DEMING, New Mexico, a municipal corporation, and George A. Dowdie, Mayor of the Village of Deming, New Mexico, and William Burt, Ed Babers, George Whittenberg and Ernest Flores, constituting the Board of Trustees of the Village of Deming, New Mexico, in their official capacities respectively as such, Plaintiffs-Appellees,

v.

The HOSDREG COMPANY, Inc., a New Mexico Corporation, Defendant-Appellant.

No. 6023.

Supreme Court of New Mexico.

Nov. 20, 1956.

Garland & Sanders, Las Cruces, for appellant.

Seth & Montgomery, William R. Federici, Santa Fe, Bert E. Newland, Deming, for appellees.

Joe W. Wood, Farmington, James V. Noble, Las Vegas, T. E. Lusk, Carlsbad, W. F. Kitts, Albuquerque, Brenton & Boyce, Carrizozo, F. S. Merriau, Raton, amici curiæ.

PER CURIAM.

Upon consideration of this case on rehearing the Court has decided to withdraw the opinion on file and substitute the following therefor:

SADLER, Justice.

We are called upon to decide in reviewing the judgment entered in an action for declaratory judgment whether L.1955, c. 234, and Ordinance No. 251 of the Village of Deming, Luna County, New Mexico, enacted pursuant thereto, are valid in view of numerous constitutional objections raised against both the statute and the ordinance. The district court upheld both of them and rendered a declaratory judgment accordingly. We are asked to overturn that judgment.

We can best indicate the nature and purpose of the act by quoting section 2 thereof wherein the legislature itself makes a declaration on the subject. It reads:

"Section 2. Legislative Intent.—It is the intent of the legislature by the passage of this act to authorize municipalities to acquire, own, lease or sell projects for the purpose of promoting industry and trade by inducing manufacturing, industrial and commercial enterprises to locate or expand in this state, promoting the use of the agricultural products and natural resources of this state, and promoting a sound and proper balance in this state between agriculture, commerce and industry. It is intended that each proj-

ect be self-liquidating. It is not intended hereby to authorize any municipality itself to operate any manufacturing, industrial or commercial enterprise. This act shall be liberally construed in conformity with the said intent."

The enabling act under challenge in the proceeding out of which arises the judgment before us for review was enacted by the 1955 legislature as chapter 234 of the session laws of that year. It consists of some fourteen sections and its purpose is well stated in the copy of section 2 thereof, as next above set out. A statement of the important provisions of the act is indispensable to a clear understanding of the constitutional objections urged against it.

Keeping in mind, then, the end sought to be served by passage of the act as indicated in section 2 thereof, the legislature conferred on municipalities of the state as defined in section 1 of the act the power: (a) to acquire by construction, purchase, gift or lease, one or more projects, located within New Mexico to be located within or without the municipality, or partially within or without the same, but not to be located more than 15 miles outside the corporate limits of the municipalities; (b) to sell or lease or otherwise dispose of any or all of its projects upon such terms and conditions as the governing body of the municipality should deem advisable and as are not in conflict with the provisions of the act; (c) to issue revenue bonds for the purpose of acquiring, by construction and purchase, or either, any project, and to secure the payment of such bonds, all as in the act provided. It was declared, however, that no municipality should have the power to operate any project as a business or in any manner except as lessor thereof.

The act empowers the issuance of bonds by the municipality to finance projects but specifically and expressly declares any such bonds shall not be the general obligation of such municipality within the meaning of Article IX, sections 12 and 13 of the Constitution of the State of New Mexico. The bonds are to be payable solely out of the revenues derived from the project to finance which the bonds are issued. They are never to constitute an indebtedness of the municipality within the meaning of any state constitutional provision or statutory limitation and shall never constitute nor give rise to a pecuniary liability of the municipality or a charge against its general credit or taxing powers, a fact to be stated plainly in the face of each said bond.

The bonds so issued may be executed and delivered at any time, may be in such form and denominations and of such tenor, and may be in registered or bearer form either as to principal or interest or both, may be payable in such installments and at such time or times not exceeding thirty years

from date and bear interest at such rate or rates and contain such provisions not inconsistent with the act, all as provided in the ordinance and proceedings of the governing body whereunder the bonds shall be authorized for issuance.

The bonds so issued under authority of the act may be sold at public or private sale in such manner and from time to time as may be determined by the governing body to be most advantageous, and the municipality is authorized to pay all expenses, attorneys, engineering and architects fees, premiums and commissions deemed necessary or advantageous by the governing body in connection with the sale and issuance thereof. All bonds issued under authority of the act and all interest coupons applicable thereto shall be construed to be negotiable.

The act declares the principal and interest on any bonds so issued shall be secured by a pledge of the revenues out of which the bonds are made payable; may be secured by a mortgage covering all, or any part, of the project from which the revenues so pledged are derived and may be secured by a pledge of the lease of such project.

It is further provided that the ordinance and proceedings under which any such bonds are issued, or any such mortgage, may contain any agreement and provisions customarily contained in instruments securing bonds; provided, however, that in making any such agreements or provisions the municipality shall not have power to obligate itself except with respect to the project and the application of the revenues therefrom but *shall not have the power to incur a pecuniary liability or a charge upon its general credit or against its taxing powers.*

The act goes on to provide the proceedings authorizing any bonds thereunder and any mortgage securing the same may provide the procedure and remedies in the event of default in payment of the principal or interest on such bonds or in the performance of any agreement. No breach of any agreement so made shall impose any pecuniary liability upon a municipality or any charge upon its general credit or against its taxing powers.

We next find provision for regulations respecting the leasing of projects. Before any project can be leased, the governing body must determine and find: the amount necessary in each year to pay the principal of and interest on bonds proposed to be issued to finance such project; the amount necessary to be paid each year into any reserve funds which the governing body may deem it advisable to establish in connection with the retirement of the bonds and the maintenance of the project; and unless the terms under which the project is to be leased provide for maintenance of the project and the carrying of proper insurance with respect thereto, the estimated

cost of maintaining the project in good repair and keeping it properly insured.

The determinations and findings of the governing body so required to be made must be set forth in the proceeding under which the proposed bonds are to be issued; and before the issuance of any such bonds, the municipality shall lease or sell the project to a lessee or purchaser under an agreement conditioned upon the completion of the project and providing for the payment to the municipality of such rentals or payments as, upon the basis of such determinations and findings, will be sufficient (a) to pay the principal of and interest on the bonds issued to finance the project, (b) to build up and maintain any reserve deemed by the governing body to be advisable in connection therewith, and (c) to pay the costs of maintaining the project in good repair and keeping it properly insured, unless the agreement or lease obligates the lessee to pay for the maintenance and insurance of the project.

Provision is to be found in the act for the refunding from time to time by the municipality through the issuance of its refunding bonds in such amounts as the governing body may deem necessary but not exceeding any amount sufficient to refund the principal of the bonds so to be refunded, together with any unpaid interest thereon and any premiums and commissions necessary to be paid therewith. Other provisions in connection with the refunding not material to the present controversy are set out in the act. It is important to state, however, a proviso near the end of the section dealing with refunding the bonds which reiterates a declaration running through the entire act, namely, that the refunding bonds, as in the case of original bonds, shall be payable solely from the revenues out of which the bonds to be refunded were payable, and shall be subject to the provisions contained in section 4 of the act touching the issuance of bonds to be issued for financing projects and may be secured in accordance with the provisions of section 5 thereof relating to the security for such bonds.

The proceeds from the sale of any bonds issued under the act shall be applied only for the purpose for which the bonds were issued; provided, however, that any accrued interest and premiums received in any such sale shall be applied to the payment of the principal of or the interest on the bonds sold.

The cost of acquiring any project shall be deemed to include the following: the actual cost of construction of any part of a project which may be constructed, including architects, attorneys and engineers fees; the purchase price of any part of a project that may be acquired by purchase; the actual cost of the extension of a utility to a project site, all expenses in connection with the authorization, sale and issuance of the bonds to finance such acquisition;

and the interest on such bonds for a reasonable time prior to construction, during construction and not exceeding six months after completion of construction.

It is declared in the act that no municipality shall have power to pay out of its general funds or otherwise contribute any part of the cost of acquiring a project, and shall not have the power to use land already owned by the municipality or in which it has an equity, for construction thereon of a project or any part thereof. The entire cost of acquiring any project must be paid out of the proceeds from the sale of bonds issued under the authority of this act; provided, however, that this provision shall not be construed to prevent a municipality from accepting a donation of property to be used as part of any project, or money to be used for defraying any part of the cost of any project.

All·bonds issued under the provisions of the act are made legal investments for savings banks and insurance companies organized under the laws of New Mexico. In addition, bonds authorized by the act and the income from same, all mortgages or other security instrument executed as security for said bonds, all lease agreements made pursuant to the provisions of. the act, and derived from any lease or sale by the municipality thereof are made exempt from all taxation by the state of New Mexico; or any subdivision thereof.

The legislature declares in a closing paragraph of the act that nothing contained in it shall be construed as a restriction or limitation upon any powers which a municipality might otherwise have under any laws of this state, but shall be construed as cumulative. Furthermore, the act provides it shall not be construed as requiring an election by the voters of a municipality prior to the issuance of bonds thereunder by it. Nor shall notice, consent, or approval by any governmental body or public officer to the sale or issuance of any bonds or the making of a mortgage under the authority of the act, except as in the act provided.

The act closes with a severability clause declaring that, if any section, clause, provision or portion of the act shall be held invalid or unconstitutional by any court of competent jurisdiction, such holding shall not affect any other section, clause or provision of the act which is not in and of itself unconstitutional.

As an initial step toward availing itself of the supposed benefits and advantages to result from the statute, the Village of Deming, one of the plaintiffs herein, enacted its Ordinance No. 251 pursuant to provisons of the act. It was duly adopted on August 23, 1955. Under its terms the village was authorized to issue revenue bonds conformably to terms of the act to finance a manufacturing project to be subsequently owned by it following acquisition. .

The estimated cost of acquiring the project was fixed at $15,000,000. The ordinance went on to recite the village and entered into a tentative lease agreement with the defendant, a manufacturing company, located in an area of less than a fifteen mile radius of the village, the principal terms of which lease were incorporated in the ordinance.

Neither in the ordinance itself, nor elsewhere in the record is it disclosed just the nature of the product the defendant proposes to manufacture, an omission to be sure which can have no bearing on a decision of the issues presented for our consideration and determination. It is not questioned by either party but that Ordinance No. 251 contains the conditions and provisos required by the act pursuant to which it was enacted.

Just as in the enabling act pursuant to which it was adopted, the Ordinance No. 251 declared its purpose in section 1 thereof, as follows:

"Section 1. That for the purpose of inducing a manufacturing enterprise to locate within the Village of Deming or immediate vicinity thereof, and thus promoting a sound and proper balance between agriculture, commerce and industry and thus enhancing the general welfare of the citizens of the Village of Deming, Luna County, New Mexico, it is hereby declared necessary and

desirable that said Village make and issue its revenue bonds," etc.

The legislation in question represents but one of several states which within the past few years have passed laws calculated to contribute to the industrial development and economic welfare of municipalities within the respective states. See II Ala.Acts 1951, No. 756, p. 1307; Baldwin's Ky.Rev.Stat. Ann.1955, § 103.200 et seq.; Tenn.Pub.Acts 1951, c. 137, § 1 et seq.; La.Acts 1954, Const. Amend., p. 145, to mention some of them. As was to be expected with the advent of such legislation, litigation followed in most of the states incident to efforts to put into practical operation the statutes in question with the result that their validity was challenged on numerous constitutional grounds. Such has been the case in New Mexico, as indicated by the present suit.

Counsel for the defendant company have just about run the scale, so to speak, in the number of attacks leveled at the enabling act, L.1955, c. 234, upon constitutional grounds. They say it is bad because:

(1) It violates Const. Art. IX, § 12, by creating a municipal debt without a favorable vote of the electors in a popular referendum.

(2) It violates Const. Art. IX, § 12, in the further respect that both the act and Ordinance 251 propose to create a debt in excess of the constitutional limitation.

(3) It violates in effect, or spirit, Const. Art. IX, § 14, proscribing the making of "any donation to or in aid of * * * a private corporation," by giving aid to private enterprise.

(4) It violates Const. Art. VIII, § 1, in the tax exemption given requiring taxes to be equal and uniform on subjects of taxation of the same class.

(5) It presents a program, the whole of which is in violation of public policy.

The first two objections, mentioned above, are so closely related, they may be more or less considered together. We refer to the complaint that the statute is bad because it violates Const. Art. IX, § 12, in creating a debt without a popular referendum on its wisdom and, also, in that the act and the ordinance propose to create a debt in excess of the constitutional limitation.

■ Neither objection is good. In the first place, time and again, both the act and ordinance, expressly deny the municipality power to create any pecuniary liability against the town or city at large, that is, payable as a general obligation of the municipality. The bonds themselves to be issued under authority of the act and ordinances are payable, only and solely, from the revenues derived from the project to finance which the bonds are issued. In order to demonstrate just how meticulous the legislature was in forestalling even the slightest contribution to the project from its general funds or assets, note this language from section 9 of the act. It reads:

"No municipality shall have the power to pay out of its general funds or otherwise contribute any part of the costs of acquiring a project, and shall not have the power to use land already owned by the municipality, or in which the municipality has an equity, for construction thereon of a project or any part thereof. The entire cost of acquiring any project must be paid out of the proceeds from the sale of bonds issued under the authority of this act; provided, however, that this provision shall not be construed to prevent a municipality from accepting donations of property to be used as a part of any project or money to be used for defraying any part of the cost of any project."

■ We have held more than once that revenue bonds or other state or municipal obligations which do not engage the general taxing power of the state, or a political subdivision thereof, are not within the prohibition of Const. Art. IX, §§ 12 and 13, either as to the requirement for approval of a popular referendum, or as exceeding constitutional limitation on indebtedness. This is so simply because the indebtedness created by the revenue bonds or like municipal obligations are not the kind of "debt" the framers of the con-

stitution had in mind and were talking about in sections 12 and 13 of Art. IX of the Constitution. Seward v. Bowers, 37 N.M. 385, 24 P.2d 253; State ex rel. Capitol Addition Building Commission v. Connelly, 39 N.M. 312, 46 P.2d 1097, 100 A.L.R. 878.

Coming now to the third challenge to validity of the act from a constitutional standpoint, to-wit: Does the act "make a(ny) donation to or in aid of any * * private corporation"? Or, to put the question more squarely in view of the pleadings before us, the findings of the trial court and, more especially, in the light of the manner in which the question was argued orally and in the briefs on original hearing: Does the giving of aid to private enterprise, here shown, amount to the making of a donation to a private corporation within the prohibition of Const. Art. IX, § 14?

■ A careful reading of the constitutional provision invoked in this challenge seems convincing that it does not. Let us first, however, preliminary to further discussion of the point, settle just what challenge was made and determined below. The particular challenge set up in the complaint, confining it specifically to the main reliance as error here, reads:

"That bonds issued under said Act and Ordinance would constitute the giving of aid to private enterprise * * * contrary to Section 14, Article IX of the Constitution of the State of New Mexico."

Constrast this with Const. Art. IX, § 14, which so far as material reads:

"Neither the state, nor any county, school district, or municipality, except as otherwise provided in this Constitution, shall * * * *make any donation to or in aid of any * * * private corporation, * * *.*" (Emphasis ours.)

Can one find any language in the foregoing quotation which expressly proscribes "the giving of aid to private enterprise" in the abstract? To be sure, express language is found denying the state and every municipal subdivision the right to "pledge its credit, or make any donation to or in aid of * * * any *private enterprise for the construction of any railroad;*" etc. (Emphasis ours.) The italicized language is not involved here, since obviously the defendant is not a railroad and does not propose to construct one.

So it is that we look in vain in Const. Art. IX, § 14, for any language expressly proscribing "the giving of aid to private enterprise," the doing of which seems to be the gravamen of the charge laid at the door of the questioned act. What, then, does this all mean? Undoubtedly, that what the complaint sought to charge and the court to deal with in its findings was a claimed violation of the constitutional

proviso in question in the respect of making "a donation to or in aid of a(ny) private corporation." Viewed thus, we must supply a breach of the quoted language as a matter of interpretation. When we resort to this means of establishing invalidity, we run into difficulties.

To elucidate, we either hold as a matter of law that the phrases "a donation to or in aid of a private corporation" and "the giving of aid to private enterprise" are synonymous; thereby supplying by intendment the latter phrase, as the equivalent of the former; or, we must hold the two phrases are not always or, necessarily, synonymous, thus leaving the door open for incidental aid or resultant benefit to a private corporation or other named recipients from given legislation, without necessitating a declared breach of this provision of our Constitution.

Webster's New International Dictionary (2nd Edition) Unabridged (1953) defines "donation" as a "gift" and as a "gratuitous transfer of property from one to another." In the same edition of this dictionary "gift" is defined as "anything voluntarily transferred by one person to another without compensation; a present." A review of our prior decisions dealing with these words discloses a somewhat cautious interpretation given the questioned word "donation." See Harrington v. Atteberry, 21 N.M. 50, 153 P. 1041; White v. Board of Education, 42 N.M. 94, 75 P.2d 712; Hutcheson

v. Atherton, 44 N.M. 144, 99 P.2d 462; State ex rel. Sena v. Trujillo, 46 N.M. 361, 129 P.2d 329, 142 A.L.R. 932. Compare, State ex rel. Hudgins v. Public Employees Retirement Board, 58 N.M. 543, 273 P.2d 743, however, where the court held the facts then present failed to disclose a "donation" within the prohibition of Const. Art. IX, § 14.

We think it fair to say from a review of the cases cited dealing with the term "donation," as found in this proviso of the Constitution, that the word has been applied in its ordinary sense and meaning, as a "gift," an allocation or appropriation of something of value, without consideration to a "person, association or public or private corporation."

What we hold is that there is not here present on the record before us a "donation to or in aid of any * * * private corporation" in violation of Const. Art. IX, § 14, or the "giving of aid to private enterprise," even if the latter phrase should be read into the questioned proviso as a matter of construction. This, we think, should not be done, save only where the "aid or benefit" disclosed, by reason of its nature and the circumstances surrounding it, take on character as a donation in substance and effect.

As mentioned above, several states have enacted legislation within the somewhat recent past very similar to the act now be-

fore us. See, Faulconer v. City of Danville, 313 Ky. 468, 232 S.W.2d 80; Newberry v. City of Andalusia, 257 Ala. 49, 57 So.2d 629; Holly v. City of Elizabethton, 193 Tenn. 46, 241 S.W.2d 1001. Touching the constitutionality of the questioned act as to a challenge here made, the Supreme Court of Kentucky in Faulconer v. City of Danville, supra, said [313 Ky. 468, 232 S.W.2d 83]:

"The courts of the country are of divided opinion, though the majority hold that the encouragement and promotion of a specific industrial enterprise under an arrangement similar to the present where it involves the taxing power is beyond the constitutional power of a legislature or a municipality. 30 Am.Jur., Mun.Corp., Sec. 402; Annotations, 14 A.L.R. 1165, 112 A.L.R. 571, 115 A.L.R. 1436. Unlike the statute providing for the acquisition and development of public projects generally by the revenue bond plan (Ch. 58, KRS) the statute under which this project is being developed contains no provision permitting the use of general funds or revenues to finance the same, or the payment of any bonds issued therefor. The statute, the ordinance and the bonds themselves, all, state the security and source of payment to be the rents. This is in accord with many revenue bonds issued under authority of different statutes and declared by

this court not to be obligations of the governmental unit issuing them, whether state, county or school district. * * *"

In Holly v. City of Elizabethton, supra, the Supreme Court of Tennessee had before it an act of a kind very similar to the one now before us. Numerous objections to it upon constitutional grounds were urged and denied. Among other things, the court said:

"Thus, the question we have here is whether our Legislature may constitutionally authorize the municipalities of this State to acquire through the issuance of bonds an industrial building and lease the same to a private industry for conducting within or near that municipality of a private industrial business when [here follows statement of the conditions attending launching of the project identical in import with those in our act] * * *.

"The question is new to the Courts of our State and arises from the enactment of a statute that seems to be of comparatively recent origin in this country. The brief of appellees makes reference to similar statutes of Florida, Kentucky and Alabama which were sustained by their respective Courts of last resort. See State v. City of Tallahassee, 142 Fla. 476, 195 So. 402; Faulconer v. City of Danville, 313 Ky.

468, 232 S.W.2d 80; and Opinion of the Justices, No. 120, 254 Ala. 506, 49 So.2d 175. The Illinois case of Poole v. City of Kankakee, 406 Ill. 521, 94 N.E.2d 416 is another case in which such a statute was held to be a valid enactment.

"In the end, however, we must look to our own Constitution rather than to a decision of another State, based upon its Constitution, to determine whether Chapter 137 of our 1951 Public Acts violates our Constitution. It is neither contended nor perceived that this statute offends the Federal Constitution.

"In so considering the question, the Court must be controlled by the fact that our Legislature may enact any law which our Constitution does not prohibit, and the Courts of this State cannot strike down one of its statutes unless it clearly appears that such statute does contravene some provision of the Constitution. Joyner v. Priest, 173 Tenn. 320, 326, 117 S.W.2d 9.

"Unless a statute, under attack as to its constitutionality, expressly or by unavoidable implication violates some specific provision of our Constitution it cannot be annulled 'upon supposed natural equity, the inviolate rights of free man' or because the Court thinks that 'it is opposed to a spirit supposed to pervade the constitution, but not expressed in words', and whether such 'statute is contrary to the genius of a free people is a question for the legislature, and not the courts'. Henley v. State, 98 Tenn. 665, 682, 41 S.W. 352, 355, 1104, 39 L.R.A. 126.

\*　　\*　　\*　　\*　　\*　　\*

"The promotion of the industry authorized by the hereinbefore mentioned provisions of Chapter 137 is clearly of incidental public benefit to the municipality where such industry may be located at least, to the extent that it will furnish employment to a substantial number of its inhabitants. It is, then, at least incidentally for a public purpose, though it results in the promotion of and gain to a private corporation.

"There is nothing in the Constitution which forbids our Legislature from authorizing a municipality to promote a private industry in the manner authorized by the aforementioned provision of Chapter 137, since those provisions do not authorize the use of moneys raised by taxation for the accomplishment of the incidental public purpose intended. Therefore, for emphasis, as in Nichol v. Mayor and Aldermen of Nashville, 28 Tenn. 252, and City of Memphis v. Memphis Gayoso Gas Co., 56 Tenn. 531, 538, 'it may be asked, is there any wrong in this. Is there anything against the public good in this?

Is there anything against law in this? Surely not.'

"For the reasons stated, the Court concludes that the aforementioned provisions of Chapter 137 of the Public Acts of 1951 are not unconstitutional. These provisions of that statute legally authorize the City of Elizabethton to issue the proposed bonds for the acquiring by purchase or construction of an industrial building as defined by that statute, and to lease it in accordance with the above mentioned provisions of the statute to some private industrial concern. * * *" [193 Tenn. 46, 241 S.W.2d 1004.]

The court declined to decide certain questions determined below but thought not ripe for decision in the case, which are not present here. It closed its opinion by stating:

"The decree of the Chancellor will be modified so as to pretermit determination of the two questions pretermitted in this opinion with reference to subsection (1) of Section 4 of the Act. As so modified, that decree will be affirmed."

The Supreme Court of Alabama in Newberry v. City of Andalusia, supra, had before it many objections not raised here concerning which it is unnecessary for us to express an opinion. It sustained the act over the many objections urged against

it. Touching, generally, upon the power of the municipality in the premises, the court said:

"There is no merit to the appellant's insistence that the Legislature lacks the power to authorize a municipality to own or lease projects of the type authorized by Act No. 756. Except insofar as specifically limited by the Constitution of Alabama and the Constitution of the United States, the full legislative power of the State is vested in the Legislature. Section 44, Constitution of 1901; State ex rel. French v. Stone, 224 Ala. 234, 139 So. 328; Sheppard v. Dowling, 127 Ala. 1, 28 So. 791, 85 Am.St.Rep. 68. That a state Legislature has the power to authorize revenue bond financing of industrial development projects to be leased to private persons is in accord with the prevailing view in other states. Faulconer v. City of Danville, 313 Ky. 468, 232 S.W.2d 80; Holly v. City of Elizabethton, [193 Tenn. 46] 241 S.W. 2d 1001; State v. City of Tallahassee, 142 Fla. 476, 195 So. 402; Poole v. City of Kankakee, 406 Ill. 521, 94 N.E. 2d 416." [257 Ala. 49, 57 So.2d 637.]

True enough, there was a dissent in the Newberry case by one of the justices, concurred in by another, giving the decision a 5 to 2 margin in its favor. Indeed, the dissenting opinion in this case plus such comfort as may be derived from anything

said in State v. Town of North Miami, Fla., 59 So.2d 779, represent just about the roll of authority to be marshalled against, compared with the three cases just quoted from which support, the validity of statutes with almost identical enactments. Nor is the authority of cases representing the majority to be weakened by the claim that the states from which they come lack constitutional provisions such as ours condemning donations in aid of private corporations. Alabama and Kentucky, to say the least, both have constitutional provisions of similar import. See Ala.Const. §§ 93–94 and Ky.Const. § 177.

We find nothing in City of Clovis v. Southwestern Public Service Co., 49 N.M. 270, 161 P.2d 878, 161 A.L.R. 504, in conflict with what we here hold. Indeed, for such bearing as it may have on the question at issue, the case lends support rather than opposition to the result we announce.

It is claimed the provisions of the act authorizing payment of fees of attorneys, architects and engineers from proceeds of the revenue bonds renders the act unconstitutional and violative of Const. Art. IX, § 14. We have held this proviso of the constitution not violated by the issuance of these revenue bonds. This being so, before the act may be stricken down for payment of the fees mentioned from the proceeds, some specific provision of the constitution must be pointed out which it does violate. None has. See, Varney v. City of Albuqerque, 40 N.M. 90, 55 P.2d 40, 106 A.L.R. 222. See, also, Lambert v. Wharf Improvement Dist. No. 1, 174 Ark. 478, 295 S.W. 730; Robinson v. Incorporated Town of De Valls Bluff, 197 Ark. 391, 122 S.W.2d 552. In the Varney case, we said [40 N.M. 90, 55 P.2d 42]:

"Section 12 of article 9 of the State Constitution confers no powers on the city, nor does it contain a grant of power to 'qualified electors thereof as have paid a property tax therein during the preceding year.' It provides what *shall not* be done, not what may or can be done. It does not authorize municipalities to issue bonds, but prohibits their issuance unless certain conditions precedent are performed. * * *

"The appellee must look to the statutes for its authority to issue bonds, which of course cannot run counter to the Constitution. *But the power of the Legislature to prescribe the conditions under which a municipality may issue bonds is only limited by section 12 of article 9 of the Constitution but not otherwise controlled."* (Second emphasis ours.)

We find no merit in the claim that provision for payment of attorneys, architects and engineers fees invalidates the act.

It is claimed the statute is bad as presenting a program the whole of which violates

public policy. The Supreme Court of Kentucky did not think so as to similar legislation when in Faulconer v. City of Danville, supra [313 Ky. 468, 232 S.W.2d 82], it said:

"In enacting the statute under which the present venture is undertaken, the legislature deemed the acquisition and ownership by a city of an 'industrial building' to be a public project. The legislative determination of what is a public purpose will not be interfered with by the courts unless the judicial mind conceives it to be without reasonable relation to the public interest or welfare and to be within the scope of legitimate government. The consensus of modern legislative and judicial thinking is to broaden the scope of activities which may be classed as involving a public purpose."

The Supreme Court of Tennessee felt the same way about the question in Holly v. City of Elizabethton, supra. We have recognized in Hutchens v. Jackson, 37 N.M. 325, 23 P.2d 355, and Varney v. City of Albuquerque, supra, that the public policy of a state is for the legislature whose judgment as to the wisdom, expediency or necessity of any given law is conclusive on the courts unless the declared public policy runs counter to some specific constitutional objection. It fails to do so here.

Finally, it is urged that the act is invalid in that the tax exemption found in it constitutes a violation of Const. Art. VIII, § 1, providing:

"* * * Taxes shall be equal and uniform upon subjects of taxation of the same class."

Section 11 of Chapter 234, Laws of 1955, provides:

"Exemption From Taxation.—The bonds authorized by this act and the income from said bonds, all mortgages or other security instrument executed as security for said bonds, all lease agreements made pursuant to the provisions hereof, and revenue derived from any lease or sale by the municipality thereof shall be exempt from all taxation by the state of New Mexico, or any subdivision thereof."

The portion of Const. Art. VIII, actually relied upon by defendant in its answer, to-wit, the quoted language of section 1, supra, must be viewed in the light of other language found in section 3 of the same Article. So far as material it reads:

"The property of the United States, the states and all counties, towns, cities and school districts, and other municipal corporations, public libraries, community ditches and all laterals thereof, all church property, all property used for educational or charitable purposes, all cemeteries not used or held for private or corporate profit, and all bonds of the state of New Mexico, and

of the counties, municipalities and districts thereof shall be exempt from taxation."

In its decision, the trial court as paragraph 9 thereof found:

"That Section 11 of Chapter 234, Laws of New Mexico, 1955, exempting the bonds proposed to be issued under said act and ordinance and the income therefrom is not invalid and is not unconstitutional in that it violates Section 1 of Article VIII of the Constitution of the State of New Mexico, but on the contrary is constitutional and in full accord with Section 3, Article VIII of the Constitution of the State of New Mexico."

The court concluded and adjudged there was no breach of the provisions of Const. Art. VIII, and we are asked to overturn its ruling in this particular. There is considerable doubt about the right of defendant to raise the point, as well as the timeliness of its presentation. Furthermore, the act contains a severability section. Thus, even if defendant should be sustained in this claim of error, it would not invalidate the whole act. Assuming, however, defendant's right to present the question, the parties having argued the point at length and the question being one of great public importance, we feel disposed to express our views concerning same.

First, let us see just what claim is made for the exemption clause found in the act. Counsel for the plaintiff (appellee) in their brief on rehearing assert:

"The provision is clear and extends only to the municipality. Of course, under a lease arrangement whereby the city owns the land, no ad valorem taxes would be imposed, but then does not that apply to all other municipal projects, such as airports, recreational areas and other community and civic non-profit sponsored activities?"

█ In reaching the conclusion he did the trial judge drew upon the language of Const. Art. VIII, § 3, exempting the property of the state and municipal subdivisions thereof, as well as bonds issued by them. There is nothing in the act exempting the defendant from ad valorem taxes on its leasehold interest, raw materials, stock and equipment. Nor are private corporations absolved from payment of income, privilege or other excise taxes. Whether the foregoing considerations moved the legislature to grant the exemption it did, we are not prepared to state. Suffice it to say that insofar as the exemption is confined to municipal property there is no violation of the constitution in the particular charged. Const. Art. VIII, § 3; 51 Am. Jur., "Taxation," page 557, § 567; Hillard v. City of Mobile, 253 Ala. 676, 47 So.2d 162.

This represents the most serious question raised against any portion of the act assailed. It is easy enough to indict by example, sometimes specious, any tax exemption. But where, as here, we can see in the questioned measure the public purpose essential to its support, we do not have to resort to strained construction to see in the questioned act a mere legislative effort to vitalize and render effective an exemption contained in the constitution, itself, in favor of one of its political subdivisions.

The effort to bolster the sagging economy in and around some of our cities and towns over the state is, of course, entirely commendable. The closing of the coal mines in Colfax County, the drought in other sections of the state, as well as untoward economic factors elsewhere, all have been the cause of deep, statewide concern. Any movement reasonably calculated to improve the economic welfare of the people as a whole through furnishing employment, promoting industry and trade, and inspiring new hope, seems well worthwhile. Whether the present enactment will achieve these aims, none can tell. Only trial, effort and actual experience can give the answer.

While operation of a given project, in the field of competition, may hurt some, if the overall picture shows a comfortable balance of advantages over disadvantages to the many, none can doubt that the measure authorizing it has justified its enactment. After all, the question is one of policy and, within constitutional bounds, that is for the legislature. Even though we may question the wisdom of a given enactment, as a matter of policy, that gives us no right to strike it down, if it violates no provision of the fundamental law.

Other questions have been argued incidental to the main one relied upon. It would unduly extend this opinion to attempt to deal with each such question. Those not expressly ruled upon are either resolved by what we have said or are deemed without merit.

Finding no error the judgment of the trial court will be affirmed.

It is so ordered.

COMPTON, C. J., and LUJAN, J., concur.

McGHEE and KIKER, JJ., dissenting.

McGHEE, Justice, (dissenting).

My views have been expressed heretofore in the opinion unanimously concurred in by the membership of this Court, now withdrawn by the majority opinion. I remain of the opinion the program inaugurated under Ch. 234, Laws of 1955, and Ordinance No. 251 of the Village of Deming, violates § 14, Art. IX of the New Mexico Constitution, for thereunder a private corporation will receive substan-

tial benefits through the offices of the Village which the latter enjoys only by virtue of being a governmental authority. These benefits are, I believe, subject to precise monetary calculation as respects the tax freedom the program will apparently now enjoy. And if no exact figure may be given for the value to private industry of a municipal revenue bond issue, it nevertheless has a real value. Yet because no money passes directly from the Village to the defendant the majority opinion tells us no donation has been effected. I doubt that any good businessman would endorse this artifice.

With the exception of the Florida courts, all the authorities have approved similar industrial programs and the voices of dissent are few. Certain of these cases are relied on by the majority opinion. Others are: Halbert v. Helena-West Helena Indus. Develop. Corp., Ark.1956, 291 S.W.2d 802; Wilmington Parking Authority v. Ranken, Del.1954, 105 A.2d 614; Dyche v. City of London, Ky.1956, 288 S.W.2d 648; Miller v. Police Jury of Washington Parish, 1954, 226 La. 8, 74 So.2d 394; North Carolina State Ports Authority v. First-Citizens Bank & Trust Co., 1955, 242 N.C. 416, 88 S.E.2d 109.

Some of these cases involve instances where the taxing powers are invoked in aid of the project, and the case from Arkansas is perhaps most notable of all in that the bonds are issued by a local development non-profit corporation, not a division of government, and the State Board of Finance is given discretion to purchase as much as fifty percent of the principal amount of the bond issue up to a certain amount.

To anyone who sees, as I do, a tangible donation made by municipal government to a private corporation or concern in these programs, the reading of the authorities is an Adventure in Wonderland where naught is upside-down to anyone but him. I am immune to the "Take-Me" formula composed of municipal ownership and the stated policy of balancing economy.

The feature of municipal ownership is a sham. By the tentative lease the defendant leases the project for 30 years for an annual rental sufficient to discharge the bonds, and other expenses ($15,000,000) and at the end of the term may renew the lease for another 30-year period at annual rental of $1,000 or purchase the project outright for $10,000. Assuming that the business lessee does operate the project for the initial thirty-year period, at the termination thereof, the lessee having been under obligation to maintain the plant in good repair, even deducting then allowable depreciation, the plant would still be worth the substantial part of the original capital investment, $15,000,000, if not in excess thereof. I have no doubt the lessee would choose to renew for an additional thirty-year term, at rental of $1,000 per year, in

preference to purchasing the plant for $10,-000, in order to avail itself of continued freedom from taxation, for the amount saved in tax exemption over the additional thirty-year term would certainly exceed the liability for payment of rentals. In effect a donation of tax exemption for sixty years has been approved. It is no less forbidden surely to contract to make a future donation than to make such donation presently.

We are told by the Act, the proposed Lease, and the majority of this Court that the project is to bring about that great public good—a balanced economy. What we are not told is that the defendant lessee is under no obligation to serve the public or its policy, and authority for the Village itself to operate the project is expressly denied by the Act. The honeymoon of this marriage between municipal government and business may not continue indefinitely. See, for example: Greenfeld v. Supervisors' Dist. No. 3 of Perry County, 5 Cir., 1953, 205 F.2d 323.

While the Village will suffer no direct liability to retire the revenue bonds from municipal funds, if it should befall that the defendant is in default in its obligation, the Village will still have outstanding at least a titular indebtedness, which certainly would affect the credit of the Village and render any future sale of revenue bonds for some municipal program greatly more difficult and probably more expensive. See

66 Harv.L.Rev. 898; 35 Va.L.Rev. 285, pp. 293, 294.

The majority make considerable show of their unwillingness to read words into our constitutional provision, and also insert a "red herring" in discussing railroad construction. The provision in question reads:

"Neither the state, nor any county, school district, or municipality, except as otherwise provided in this Constitution, shall directly or indirectly lend or pledge its credit, or make any donation to or in aid of any person, association or public or private corporation, or in aid of any private enterprise for the construction of any railroad; provided, nothing herein shall be construed to prohibit the state or any county or municipality from making provision for the care and maintenance of sick and indigent persons." § 14, Art. IX.

The majority have judicially amended this provision by adding, following the word "railroad", *unless the public might receive some incidental benefit therefrom.*

The majority opinion also sets up a new rule that tax exemptions are to be *liberally* construed. The outmoded rule of strict construction is stated in Peisker v. Unemployment Compensation Commission, 1941, 45 N.M. 307, 115 P.2d 62, to mention but one case.

For the reasons stated, I dissent.

KIKER, J., concurs.